CHURCHILL EVANGELISTIC ASSOCIATION, INC., Plaintiff, *v.* COLUMBIA BROADCASTING SYSTEM, INC., and Another, Defendants.

Supreme Court, Erie County, December 15, 1931.

*Coatsworth & Diebold [Charles Diebold, Edward L. Jung* and *Ralph K. Robertson* of counsel], for the plaintiff.

*Locke, Babcock, Hollister & Brown [Louis L. Babcock, Harold S. Brown, Ralph F. Colin* and *Sidney M. Kaye* of counsel], for the defendant Columbia Broadcasting System, Inc.

*Kenefick, Cooke, Mitchell, Bass & Letchworth [Lyman M. Bass* and *William P. Stewart* of counsel], for the defendant Buffalo Broadcasting Corporation.

HINKLEY, J. This is an action for specific performance of an alleged contract to require defendant Columbia Broadcasting System, Inc., to broadcast on its national network a one-hour program from eleven P. M. until midnight each Sunday evening. The transmission of that program from the tabernacle of the plaintiff to the studio of the Columbia Broadcasting System, Inc., in New York city or Chicago, would require the use of certain facilities of the defendant Buffalo Broadcasting Corporation. For that and other reasons the defendant Buffalo Broadcasting Corporation, having refused to join in this action as a party plaintiff, was properly made a party defendant in order that the court might, in a proper case, allow to plaintiff the entire relief which it seeks. (Civ. Prac. Act, §§ 194, 211.)

At the very outset the court indicates its determination that there can be found in the testimony no basis for an oral or written contract with mutual considerations and obligations flowing between the plaintiff and the defendant Columbia Broadcasting System, Inc. The claim of the plaintiff must be founded on benefits accruing to it through contractual relations created and in existence between the defendant Columbia Broadcasting System, Inc., and the defendant Buffalo Broadcasting Corporation.

The plaintiff is a religious corporation formed in the year 1920. The defendant Buffalo Broadcasting Corporation is a local corporation controlling several broadcasting stations in the vicinity of Buffalo, N. Y. The defendant Columbia Broadcasting System, Inc., is a corporation in contract with various radio stations throughout the United States and Canada and operating a national network chain or system.

The plaintiff, when radio broadcasting was in its infancy, commenced about 1925 and continued within the proper scope of its corporate powers to create and broadcast religious services. Later, with the aid of those interested in the furtherance of religious

teaching and under the guidance of a minister, the Rev. Clinton H. Churchill, the plaintiff erected, developed, owned and operated a high power full time station in the locality of Buffalo, N. Y., denominated WKBW. The Federal Radio Commission to-day and for some time past has demanded that a full time station, in order to keep its franchise alive, shall operate a minimum of sixteen hours each of the seven days of a week. The fact became patent that the plaintiff had a surplus of broadcasting time and facilities which had a vast potential commercial value. There was no legal or ethical reason to prohibit the plaintiff, as a religious corporation, nor its members as stockholders of a non-religious entity, from absorbing the surplus hours not practical for religious broadcasting. Those hours could be turned by the plaintiff corporation into a direct source of revenue for the more extended carrying of the message of God to the human race (to borrow a phrase from the complaint), and at the same time contribute to the enrichment of its active forces who, while laboring in the field, saw opportunity to provide for themselves and their families against an immediate world wide depression and the uncertainties of old age.

This situation gave birth, in the month of May, 1928, to the defendant Buffalo Broadcasting Corporation, a commercial corporation, and to a union of that corporation with the plaintiff religious association, each entity legally and properly pursuing its avowed purposes with skill, energy and foresight. The three non-participating trustees of the plaintiff, Clinton H. Churchill, Irvine J. Kittinger and Hiram W. Deyo, became the stockholders of the new corporation, the defendant Buffalo Broadcasting Corporation. The plaintiff, on June 25, 1928, leased to defendant Buffalo Broadcasting Corporation, for a period of ten years, with an option of ten more years, its station WKBW. The plaintiff reserved to itself the hours of every Sunday. On September 5, 1928, that lease was canceled by a new lease between the same parties for ninety-nine years, with a like reservation to plaintiff of the hours of every Sunday and the obligation upon the defendant Buffalo Broadcasting Corporation to broadcast, without cost to plaintiff, the latter's Sunday services. There were other stations which the defendant Buffalo Broadcasting Corporation had acquired or later acquired, known as WGR, WKEN and WMAK.

On November 23, 1928, the predecessor of the defendant Columbia Broadcasting System, Inc., made a definite, complete and written contract with the WMAK Broadcasting System, Inc., owning and operating a local station designated WMAK. Shortly thereafter the Federal Radio Commission reduced station WMAK to a half time station. The WMAK Broadcasting System, Inc., assigned

its interest in that contract to the defendant Buffalo Broadcasting Corporation.

The Rev. Mr. Churchill, while retaining the active control of the plaintiff religious association, became not only the titular executive vice-president of the defendant Buffalo Broadcasting Corporation, but actually managed the latter's affairs. The dual position occupied by Mr. Churchill in his negotiations and correspondence with the defendant Columbia Broadcasting System, Inc., is at first very confusing. While his heart was undoubtedly pleading the cause and seeking benefits for the plaintiff religious association, his hand established indubitably that in those negotiations and that correspondence he acted solely as an officer of the defendant Buffalo Broadcasting Corporation. That he could deal for both corporations contemporaneously is not contended, and by the stationery employed in the correspondence and the contents of the letters passing between the defendant Columbia Broadcasting System, Inc., and himself, the court has determined, as above indicated, that Mr. Churchill was the *alter ego* of the defendant Buffalo Broadcasting Corporation, and not the plaintiff, and that the Columbia Broadcasting System, Inc., had no direct contractual relations with the plaintiff.

Every one is agreed that the basis of the contractual relations created between the defendant Columbia Broadcasting System, Inc., and the defendant Buffalo Broadcasting Corporation, out of which plaintiff seeks benefit, is a series of letters between the two defendant corporations in which reference is made to the written contract between the predecessor of the defendant Columbia Broadcasting System, Inc., and the WMAK Broadcasting System, Inc., the assignor of the defendant Buffalo Broadcasting Corporation. These letters, while indicative of the skill, shrewdness and sagacity of the lay mind, nevertheless lack that certainty, clarity, brevity and completeness which characterize the product of legal training. Here is a clear instance where an ounce of legal counsel would have saved a pound of litigation.

A brief statement of the mechanics of national and local broadcasting is essential to an interpretation of the letters. There are but two nation-wide radio broadcasting chains or networks, the defendant Columbia Broadcasting System, Inc., and the National Broadcasting Company. Their methods of operation correspond and the rates charged by the National Broadcasting Company are slightly higher than those of the Columbia Broadcasting System, Inc. We are concerned with the defendant Columbia Broadcasting System, Inc., which has two central studios, one in New York city and one in Chicago. The company charges a definite rate

per hour or portion thereof for commercial use of its system, graded according to the number of local broadcasting stations employed. Advertising programs are transmitted by telephone to its eighty odd stations in various parts of the country and each station is paid to broadcast on its own wave length those commercial programs. Not all the available time is sold by the defendant Columbia Broadcasting System, Inc., and it is required to create programs of its own to cover the time not commercially employed. These are known as sustaining programs, are financed by the defendant Columbia Broadcasting System, Inc., and may be used or not by the local stations as they see fit. The time not used by the local stations for the commercial broadcasting of the national network may be sold by the local stations to their own advertisers. The local stations must each create its own sustaining programs for such unused time as is required to retain its franchise. Programs not originating in the New York or Chicago studios must first be transmitted by telephone to one of such studios to be sent out to the various stations as above indicated. The compensation to be paid for such telephone service is known as the line charge. The enormous commercial value of nation-wide broadcasting is reflected in the high rates charged. The advantage gained by the broadcasting of a religious program on a national network is readily apparent.

The letters in question are as follows:

" *February* 19, 1929.

" Rev. CLINTON H. CHURCHILL,
     " Radio Station WKBW,
          " Buffalo, New York.

" Dear Mr. CHURCHILL: The following will confirm the arrangements made during our very pleasant session last week:

" 1. That your company, which now controls Stations WKBW, WMAK, WKEN, and WGR, will cooperate with Columbia to the extent that we are to have call on all commercial programs which we sell for Buffalo coverage on your best station, which, according to plans now, will be WKBW:

" That you are to take as many sustaining programs over that station as possible and that you will be in a position to divert any other sustainings to any of your other stations, as you see fit;

" That the conditions and terms of our relationship shall be based on a contract which we now have existing between the WMAK Broadcasting System, Inc., and ourselves.

" 2. That your cooperation shall extend to your Sales Depart-

ment and that an enthusiastic effort be maintained to sell national advertisers over the Columbia Broadcasting System.

" 3. That we are to set aside an hour's program every Sunday, to be originated in Buffalo, to be treated as a sustaining program and offered to our basic network as such. This program is to be of very high standard musically and during the hour you are to deliver a fifteen minute sermon;

" That an advance copy of this sermon be submitted to us for our approval;

" That it is further understood at any time it is felt this program, originating from Buffalo, does not meet with popularity, or that it is not for the best interests of this Company to maintain such, we are at liberty to discontinue.

"As per our conversation, however, it is understood this is to be viewed in a broad light and that any objections received have to be well founded and of general character and not such as might come from an occasional crank.

" It is also understood that during your sermon there is to be no solicitation of funds.

" It is further understood that this broadcast is to commence at a date mutually agreed upon and which would give us plenty of time to publicize and acquaint our stations with this broadcast, and that should it be necessary to move this time because of commercial requirements or because of events of national importance, we shall have the right to do this.

" 4. That the line charge from Buffalo to New York necessary to make this broadcast possible is to be borne by you. I understand the maximum charge per week on this line is $350.00 but that it comes down as the broadcasting continues.

" 5. I am waiting to hear from you with your suggestions as to the name of this hour. After receiving these, will pick my preference or submit such other name as I think best suited, and between us we will select one which will be most effective in order to draw an audience and to get as many of our stations as possible to take this program.

"Also, that you will submit facts to me that I can send on to our stations, describing this program, with the idea of making it attractive for their use.

" I think I have covered all the points in the above. If not, wish you would send them on to me or correct the above if they are not in accordance with your understanding.

" It was a real pleasure to meet you the other day and to learn of the plans you and your associates have before you for the building up of your proposition.

" I want you to feel that Columbia stands ready to offer any aid that might be of value to you. I feel quite certain that our relationship will be of mutual advantage and I am looking forward to its continuance with a great deal of pleasure.

" Sincerely yours,

" COLUMBIA BROADCASTING SYSTEM, INC.,

" WILLIAM S. PALEY, *President.*"

" *March* 4, 1929.

" The Rev. CLINTON CHURCHILL,

" Radio Station WKBW

" Buffalo, N. Y.

" Dear Mr. CHURCHILL: We have not received your acknowledgment of Mr. Paley's letter of February 19th, outlining the terms and conditions for your station to become a part of the Columbia Broadcasting System network.

" We will appreciate hearing from you at your earliest convenience.

" Very truly yours,

" COLUMBIA BROADCASTING SYSTEM, INC.,

" (Signed) WILLIAM H. ENSIGN

"*Assistant to the President.*

" W. H. ENSIGN /H "

"*March* 9, 1929.

" Mr. WM. S. PALEY, Pres.,

" Columbia Broadcasting System, Inc.,

" Paramount Building, Buffalo, N. Y.

" Dear Mr. PALEY: Your letters of February 19th and March 4th received. As you can readily understand, it has been necessary for me to give careful consideration to your proposed arrangement before writing you, which is my reason for the slight delay.

" First, I want to express the pleasure Mr. Kittinger and I experienced in our negotiations with you while at New York.

" It occurs to me that it might be well to consider the proposed arrangement set forth in your letter of February 19th in the order in which the paragraphs appear and which will correspond to the following numbered paragraphs of this letter.

" 1.

" This paragraph is all right with the exception that where it speaks of the conditions and terms of our relationship being based on a contract you now have existing with the WMAK Broadcasting System, Inc., it is my understanding that the term of one year in the WMAK Broadcasting System, Inc., contract does not apply to this new arrangement, which, at present, is not for any definite time, but either of us — you or the Buffalo Broadcasting

Corporation — is at liberty to discontinue this new arrangement at any time on reasonable notice to the other. This, no doubt, coincides with your views as stated in your letter relative to the hour's program, that you would like to be at liberty to discontinue if, in your opinion, the best interests of your company require that to be done; and we, of course, should have the same privilege.

" 2.

" This paragraph is according to our understanding.

" 3.

" We would expect your enthusiastic cooperation in getting all the stations included in your basic network to accept our program. This is necessary in order to justify the financial sacrifice we make in arranging with you to use our principal station.

" This hour will consist of from thirty-five to forty-five minutes of music, both vocal and instrumental, of very high standard. The remainder of the hour will be devoted to a short address or talk and prayer. While the address or talk may be fifteen minutes or less, it may also at times run slightly more than that, and I would not like to be limited to an exact fifteen minutes for this part of the program. I want it understood that I am to have a reasonable latitude in this respect. You may rest assured that this entire program will contain nothing to offend good taste or people of any religious faith.

" However, due to the fact that I am an extemporaneous preacher and do not prepare my manuscripts in detail, it is not practicable to submit my sermons in advance.

" Your reservation of the right to discontinue this hour is satisfactory to us, since the whole arrangement for the time being, as I have already pointed out, is in the nature of a trial until such time as we can both determine the advisability of a more definite arrangement.

" We suggest this hour begin on Easter Sunday, March 31st, and be known as the international Back Home Hour. After careful consideration, in view of our past broadcasting, I feel confident that the type of a program we can arrange from week to week under this title would be much more popular than the broadcast of a set religious service. We now broadcast a Back Home Hour beginning at 10:15 at night and continuing until midnight. This proves to be our most popular Sunday broadcast and has received as many as fifteen hundred requests by letter during one week.

" It is my thought that we broadcast this program from 11:00 p. m. to 12:00 midnight, this time tying in with the title Back Home

Hour. This would, of course, necessitate the strict adherence to that particular hour in order for us to carry out the idea and we would not want to feel that we were to be moved from this hour, should the broadcast prove successful for all concerned, except in event of some extraordinary emergency. After careful personal consideration and conferring with my associates, our new musical director, and others interested in this class of work, I am confident that we can broadcast from week to week a program that would be eagerly looked for throughout the country as a non-sectarian religious feature. Should it suit your convenience, we would prefer to have this hour begin earlier than 11:00 o'clock, say 10:00 or 10:30 P. M., if that is possible.

" 4.

" This is according to our understanding.

" 5.

" I have endeavored to cover the matters included in this paragraph under my reply to your paragraph Numbered 3.

" Please understand that what I have said in this letter is intended to be in a most friendly and cooperative spirit to the end that our pleasant relations may continue, grow stronger and be mutually beneficial.

"As there is much to be done on our part in preparing for the initial program, may I ask you to let me know as soon as possible whether the arrangement as set forth in this letter is satisfactory to you.

.*" EX. VICE-PRESIDENT."*

*"March 23, 1929.*

" Dear Mr. CHURCHILL: You will also pardon my delay in answering your communication of March 9th, but it has been due to the extreme pressure of business.

" I will also go over your letter point by point.

" 1. We will not agree to put our contract we now have with WMAK in jeopardy because of any new arrangement we make which might not work out satisfactorily. In other words, all you request is a fair trial in your broadcast, and if same does not work out satisfactorily, I see no reason why our contractual relationship on station time should be impaired. We must at all times be protected by a Buffalo outlet, and what we are now striving to do is to improve our outlet, but in no case will we take the chance of losing at least what we are getting from WMAK. Therefore, the continuance of your personal broadcasting is to be on a trial basis, but should not in any way change arrangements if same do not prove to be satisfactory. * * * can assure you, however,

as stated in my last letter, that every opportunity for success shall be given.

(Point No. 2 omitted.)

" 3. Your condition on this point is acceptable as I feel that you should understand as well as we do how important it is in the arrangement of the program to make it pleasing, because after all, we are both very desirous of making it a success.

" I note your suggestion to call the hour the International Back Home Hour. I personally would drop the word International and call it the Back Home Hour, as I think the word International is sometimes very misleading, especially because of its connection with the International Bible Students Association.

" I note that you would like to start this broadcast on Easter Sunday, March 31st. If I had gotten to your letter in time this could have been arranged. However, we need at least two weeks from this end in order to publicize this, and make proper arrangement. Therefore, upon receipt of this letter, and if everything is satisfactory therein, you can notify me your starting date, allowing for at least two weeks at our end, preferably three if possible.

" I note what you say concerning a strict adherence to the time from 11:00 to 12:00. I can assure you we will do everything possible towards maintaining this hour, but if in a certain instance a commercial advertiser insists on this particular hour, naturally we will have to make it. However, I think we can arrange to substitute another period that will be satisfactory.

"Again apologizing for the delay in my answer, and trusting to receive a prompt reply, I remain

" Very truly yours,

" COLUMBIA BROADCASTING SYSTEM, INC.

" WILLIAM S. PALEY, *President*."

Counsel for defendants strenuously insist that these letters constitute a clear unambiguous contract and that parol evidence is not permitted as it would constitute an attempt to vary a writing. An analysis of the letters shows that they do not even establish a meeting of the minds. It can hardly be said that the parties have integrated their own agreement into a single written memorial. In the absence of subsequent performance, it is doubtful if any new rights or obligations were created by the letters.

An acceptance must be positive and unambiguous. If any provision is added to which the offerer did not assent, the consequence is not merely that this provision is not binding and that no contract is formed, but that the offer is rejected. (Williston Cont. §§ 72, 73.) Where letters are indefinite, they do not con-

stitute a complete agreement. (*Mayer* v. *McCreery*, 119 N. Y. 434.)

Mr. Paley, in his letter of February 19, 1929, definitely numbered his proposals and separated the Back Home hour from the balance of the proposed contract. He definitely anchored his offer to the WMAK contract and proposed that the Back Home hour be subject to cancellation *at any time*. Mr. Churchill, in his letter of March 9, 1929, made the Back Home hour an essential part of the "whole arrangement," all of which was to be "in the nature of a trial until such time as we can both determine the advisability of a more definite arrangement." Mr. Paley, in his reply letter of March 23, 1929, falls back upon the original WMAK contract and iterates that "the continuance of your personal broadcasting is to be on a trial basis." To this letter Mr. Churchill made no reply. Here we are turning signs and symbols into their equivalent realities. This must always be done to some extent no matter how many are the identifying tokens. In every case the words used must be translated into things and facts by parol evidence. Conversations between the active agents of the two defendant corporations and the circumstances surrounding the making of these incomplete writings are certainly competent evidence not to alter, modify nor contribute to, but to understand what they thought at the time they wrote them. (*Thomas* v. *Scott*, 127 N. Y. 141; *Emmett* v. *Penoyer*, 151 id. 567; *Newburger* v. *American Surety Co.*, 242 id. 134, 142.) The plaintiff prior thereto, and on September 5, 1928, had surrendered to the defendant Buffalo Broadcasting Corporation, by lease, its station WKBW. Whatever additional hours on Sunday the plaintiff yielded were given to the Buffalo Broadcasting Corporation and by the latter furnished entirely or in part to the defendant Columbia Broadcasting System, Inc., under the original WMAK contract or by virtue of such contractual relations as were created by the lease in question. Coming through the defendant Buffalo Broadcasting Corporation, these additional hours on Sunday did not create an independent obligation to the plaintiff upon the part of the defendant Columbia Broadcasting System, Inc. The defendant companies, each acting upon its own interpretation of the new arrangement, commenced a course of dealing which, with the exception of the Back Home hour, has ever since been maintained. The defendant Buffalo Broadcasting Corporation, with its increased facilities acquired by lease with the plaintiff of station WKBW and by purchase of the controlling stock of stations WGR and WKEN, became one of the broadcasting outlets of the defendant Columbia Broadcasting System's national network. The plaintiff began the preparation

of its Back Home hour and on October 13, 1929, the defendant Columbia Broadcasting System, Inc., began to send that hour over its national network.

The original contract between the predecessor of the defendant Columbia Broadcasting System, Inc., and WMAK Broadcasting System, Inc., had been renewed for one year until November 30, 1930, and the option remained with the defendant Columbia Broadcasting System, Inc., to renew the same for one additional year. After negotiations between the representatives of the two defendant corporations, the following letters were written:

*"February* 24, 1930.

" COLUMBIA BROADCASTING SYSTEM,
        " Mr. WILLIAM PALEY, President,
                " 485 Madison Avenue, New York, N. Y.

" Dear Mr. PALEY: In accordance with my understanding with you when I was in New York City recently, which was reported to my associates and has been approved by them, we hereby extend for two years from November 30, 1930, to November 30, 1932, your existing contract with us expiring November 30, 1930. Please write confirmation of this.

" While the present contract gave you the right to renew it for a further period of one year, you said you would be willing to definitely renew it now for the further period of two years upon the same terms and conditions as now in force.

" I feel this continuation of our contract relation, insuring to Columbia the use of our best station, is mutually beneficial.

" Personally I hope this very satisfactory arrangement will continue for a much longer period than above stated.

" With best wishes and assuring you of my hearty cooperation, I am,
                " Very truly yours,
                        " CLINTON H. CHURCHILL."

*"March* 1, 1930.

" COLUMBIA BROADCASTING SYSTEM,
        " Mr. WILLIAM PALEY, President,
                " 485 Madison Avenue, New York City.

" Dear Mr. PALEY: Supplementing Mr. Churchill's letter of February 24, 1930, confirming the renewal of your contract with us for two years from November 30, 1930, it is understood, of course, that we are to have the benefit of such standardized rates of compensation as may be adopted by you in dealing with us and broadcasters in other cities, and such reductions in line charges on

programs originating with us as you may determine to be right and proper.

"Will you please cover the matters herein referred to in your confirmatory letter?

"Thanking you and with all good wishes, I am,

"Very truly yours,

"BUFFALO BROADCASTING CORPORATION,

"By ——— KITTINGER, *President*."

"*April* 26, 1930.

"Dear Mr. KITTINGER: Please excuse my delay in replying to your letters of February 24th and March 1st. I have been out of town and on my return was so busy that I did not get to them until now.

"I confirm our election to extend the terms of the contract between your corporation and ours for two years from November 1930, *i. e.*, to expire November 30, 1932. I am glad to consent to a modification of the contract as you suggest, to the effect that if the wire charges for connecting your station to the chain should be reduced by the Telephone Company, our charges to you will be proportionately reduced.

"It is somewhat difficult for us to agree at this time to give you the benefits of any rate reductions or other advantages which we may have to include in station contracts in the future. I can assure you, however, that if there is any general modification in the standard terms of our contracts with our stations, we will include your station in the benefits of such modification.

"Very truly yours,

"WILLIAM S. PALEY, *President*.

"Mr. IRVING J. KITTINGER, Pres.

"Buffalo Broadcasting Corp.,

"Rand Building,

"Buffalo, N. Y."

The language of these letters in their reference to an extension of contract is again inept but in the light of the subsequent conduct of the parties, the construction must follow that the letters constituted a renewal for two years of whatever contractual rights and obligations had been created between the two defendant corporations. The renewal was simply an extension and created no new rights or obligations nor modified or altered such as then existed. The defendant corporations had agreed that the Back Home hour was to be upon a trial basis subject to cancellation by either party at any time. The renewal did not make definite

and binding an arrangement which, in its inception, was subject to dissolution by either party at will.

The contention of the plaintiff that by operation of law the passage of time ripened the Back Home hour part of the contract between the two defendant corporations which was optional in its inception into a definite binding agreement cannot be maintained under the facts in this case. There is nothing indicated in the correspondence upon which the court could apply that principle of law. Both writers used the word " trial " as descriptive of the Back Home hour broadcasting. Mr. Paley, however, definitely reserved the right to discontinue *at any time*. Mr. Churchill emphasized the mutual right of cancellation by extending it to the defendant Buffalo Broadcasting Corporation, and indicating that, as he stated, " the whole arrangement for the time being as I have pointed out is in the nature of a trial until such time as we can both determine the advisability of a more definite arrangement." While Mr. Paley did not agree that the whole arrangement was on a trial basis, he did agree that the Back Home hour should be so maintained. The words " on a trial basis " were not contained in the written offer of Mr. Paley in his letter of February 19, 1929. They were first employed by Mr. Churchill in his letter of March 9, 1929, and repeated by Mr. Paley in his answering letter of March 3, 1929. The words were in no sense synonymous with approval and cannot be so construed as to destroy the positive reservation in the letter of Mr. Paley of February 19, 1929, that if the Back Home hour " does not meet with popularity or that it is not for the best interests of this company to maintain such, we are at liberty to discontinue." If there is any one definite agreement between the parties as to contractual relations, it is that the Back Home hour was subject to discontinuance by either party at will. The very language of the letters excludes the operation of that principle of law that where no definite time is prescribed, the law implies a reasonable time. True, no definite time for the cessation of the Back Home hour is fixed but its cancellation at any time is specifically provided.

This is not a case of delivering goods on approval where the statute requires their return within a reasonable time after an opportunity to examine them. (Pers. Prop. Law, § 128, added by Laws of 1911, chap. 571.) This is not a case of an agreement to perform some act with the legal requirement that in the absence of a definite date for its performance, it must be performed within a reasonable time. This is not a case of an option to be exercised or a condition to be performed which, in the absence of a prescribed time, must be exercised or performed within a reasonable time. (*Catlin* v.

*Green,* 120 N. Y. 441, at p. 445.) The facts of this case do not cover the principle of law that a contract indefinite as to time to manufacture radiators and pay to plaintiff commissions and royalties may be terminated at any time. (*Cammack* v. *Slattery,* 241 N. Y. 39, at p. 44.) The court has been unable to find an authoritative case holding that a contract subject at any time to cancellation by either party gives to one party the right to specific performance as against the other's cancellation by the lapse of a reasonable or any other period of time. The broadcasting of the Back Home hour is nearest in its analogy to a contract for the services of a concert artist entour. In this State, unless a definite period of service is specified in the contract, the hiring is at will and the master has the right to discharge and the servant to leave at any time. (*Watson* v. *Gugino,* 204 N. Y. 535; *Martin* v. *N. Y. Life Ins. Co.,* 148 id. 117.) The courts strictly maintain the right of arbitrary cancellation when so expressed in a contract. (*Crawford* v. *Mail & Express Pub. Co.,* 163 N. Y. 404; *Messmer* v. *Boettger Silk Finishing Co.,* 160 App. Div. 519; *Clover Milk Co.* v. *Cushman Bros. Co.,* 31 id. 108.)

The broadcasting of the Back Home hour as a sustaining program over the national network might at any time become unpopular or antagonistic to the best interests of the defendant Columbia Broadcasting System, Inc., in the opinion of the latter's executives. The defendant Columbia Broadcasting System, Inc., following the action of its competitor, the National Broadcasting Company, determined upon a definite program of religious broadcasting. This called for the cancellation of all other religious broadcasting, including the plaintiff's Back Home hour. Nothing in the written or oral testimony nor in the renewal letters deprived the defendant Columbia Broadcasting System, Inc., of its right to so act as seemed for the best interests of the company. Nor is it obligated to continue to broadcast the Back Home hour by contractual obligations or operation of law.

The court acknowledges its personal appreciation of the genuine value throughout the nation of the services of Mr. Churchill at a time when society is so in need of the ministrations of the clergy, particularly in view of the fact that the time heretofore occupied by the Back Home hour on the Columbia Broadcasting System, Inc., has ever since its discontinuance been vacant or at most filled by a non-religious sustaining program. Equity has no power to reconstruct an evidentiary writing. (*Friedman* v. *Newman,* 255 N. Y. 340, 347.) The court, however broad its equitable powers, cannot impose obligations and create rights where none exist nor fashion out of the indefinite contractual relations of the

two defendant corporations a legal obligation upon the part of the defendant Columbia Broadcasting System, Inc., beneficial to the plaintiff nor employ the power of the court to enforce such obligation.

The determination of the question of the application of the Statute of Frauds and other contentions of the parties not indicated herein is unnecessary in the light of this decision.

Judgment may be entered in favor of the defendants, dismissing the plaintiff's complaint, with costs.