## CHURCHILL TABERNACLE v. FEDERAL COMMUNICATIONS COMMISSION.

No. 9249.

United States Court of Appeals
District of Columbia.

Argued Nov. 26, 1946.

Decided Jan. 27, 1947.

Mr. James Lawrence Fly, of New York City, with whom Mr. Joseph H. Morey, of Buffalo, was on the brief, for appellant.

Mr. Benedict P. Cottone, Gen. Counsel, Federal Communications Commission, of Washington, D. C., with whom Messrs. Harry M. Plotkin, Asst. Gen. Counsel, Federal Communications Commission, and Dee W. Pincock, Counsel, Federal Communications Commission, were on the brief, for appellee.

Before GRONER, Chief Justice., and WILBUR K. MILLER and PRETTY-MAN, Associate Justices.

GRONER, Chief Justice.

Appellant is an undenominational religious organization—a free church—primarily engaged in evangelical work in Western New York. It has a church membership of 1600 and a "supporting constituency" of over 11000. Its founder, Clinton H. Churchill, a Methodist minister, has devoted a large portion of his life to the work, and his effort in the spread of religious thinking was recognized and commended by the Supreme Court of New York as of genuine value to the nation.[1]

---

[1] Churchill Evangelistic Ass'n, Inc., v. Columbia Broadcasting System, Inc., 1931, 142 Misc. 210, 224, 255 N.Y.S. 134, 150, affirmed, 1932, 236 App.Div. 624, 260 N.Y.S. 451.

In 1926 Mr. Churchill was authorized to construct and operate a radio station in Buffalo, then and now known as WKBW. In 1928 the station's power was increased and its plant moved to a new site at a very large cost. In its early stages the station's broadcasts were confined to religious subjects, but upon insistence by the Commission of full time operation, a corporation was organized and the physical properties and the license to broadcast were leased by the Church to the corporation.

In 1931, when the Commission objected to a licensee leasing a station for operation by another, the Church and the corporation made an agreement whereby the Church sold and conveyed to the corporation all of its station property, real and personal, including the license. A copy of the contract was filed with the Commission and was approved, and renewal licenses were thereafter regularly granted to the corporation until 1942. In this contract of sale appellant reserved to itself the sole and absolute use of broadcast periods on Sunday from 6 a. m. to 1:30 p. m. from 7 p. m. to 10 p. m., and again from 11 p. m. on Sunday to 6 a. m. on Monday for the broadcasting of religious programs. In addition, the contract provided that the corporation would pay the Church $300 per week until September, 1936, and thereafter $150 each week, and would not assign,

transfer or dispose of the operating license without the written consent of the seller. In the event the corporation failed to carry out the conditions of the contract, all the right, title and interest in the property, including the operating license, would, upon written notice, revert to the Church. The contract was to continue to September 5, 2027. Later supplemental contracts somewhat extended the reserved broadcast periods to the Church.

In 1941, when WKBW made application for renewal of the license, the Commission being "unable to determine" that a renewal would be in the public interest, designated the application for hearing to determine "the existence, nature, extent and effect" of the agreement between the Church and the corporation; to examine the provisions of the agreement as to the rights which the Church had attempted to reserve; to determine whether the agreement was consistent with the provisions of Section 301 and 309(b) (1) of the Communications Act of 1934,[2] or whether the rights granted the Church by the corporation were in violation of Section 310(b)[3] of the Act, and finally to determine the extent of supervision exercised by the licensee over the programs broadcast from the station.

In August, 1943, the Church was permitted to intervene in the hearings and some time thereafter the Commission found that

---

[2] 48 Stat. 1081, 1085, Act June 9, 1934, 47 U.S.C.A. §§ 301, 309(b). The pertinent portions of these sections read as follows:

Sec. 301. "It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio * * * except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter."

Sec. 309. "(b) Such station licenses as the Commission may grant shall be in such general form as it may prescribe,

but each license shall contain, in addition to other provisions, a statement of the following conditions to which such license shall be subject:

"(1) The station license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized therein."

[3] 48 Stat. 1086, Act June 9, 1934, 47 U.S.C.A. § 310(b). This section states: Sec. 310. "(b) The station license required hereby, the frequencies authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner either voluntarily or involuntarily disposed of, or indirectly by transfer of control of any corporation holding such license, to any person, unless the Commission shall, after securing full information, decide that said transfer is in the public interest, and shall give its consent in writing."

the contract giving the Church the unfettered use and control of a radio channel for a limited period and providing for a reverter of the license in the circumstances described, deprived the licensee of its power and duty to exercise full and complete control of its station, and accordingly rendered it incapable of discharging in the public interest the responsibilities imposed by the Act of 1934.

On the basis of this finding the application for renewal was denied, but without prejudice to the licensee corporation to file a new application when it should be able to show that it would thereafter have the exclusive use and control of the station, and that no further effect would be given to the agreement with the Church.

We gather from the record that this was satisfactory to the corporation and that accordingly it complied by repudiation of its contract with the Church and that operations under its own exclusive auspices have continued, uninterruptedly to the present, with the consent of the Commission.

The Commission in its findings confined itself wholly to the matters disclosed in the contract of sale it had previously approved. It did not find that broadcasts sponsored by the Church ever offended the proprieties, or were in any respects inimical to the public interest, nor did it find that the Church at any time interfered in the management or control of the radio station, or sought in any way to influence its policy. In short, the Commission's determination is confined to a finding that it is the contract itself in the respects we have mentioned, which makes the renewal of the license contrary to the public interest. The question for decision is, accordingly, within a narrow compass and the issues may be stated conveniently in these terms:

1. Whether the decision of the Commission was arbitrary, particularly in its failure to abide by its decision, i. e., its prior approval of the terms of the contract of sale;

2. Whether there was substantial evidence to show that the contract provisions as to reservation of time and reverter of license were contrary to public interest; and

3. Whether the penalty imposed by the Commission needlessly destroyed private property in achieving a result that could have been just as well obtained under a less drastic order.

We have examined the record and have reached the conclusion that the first of the issues must be decided against appellant. This we think follows from the well settled doctrine that *res judicata* and equitable estoppel do not ordinarily apply to decisions of administrative tribunals;[4] for such tribunals are in this respect—and in many others—*sui generis,* and this the Supreme Court has emphasized in warning us that we may not transplant into the realm of administrative law rules of procedure, trial and review which have evolved in the history and experience of courts.[5] Though the reasoning in this respect may be tenuous, we are in duty bound to give it effect, and accordingly to hold that the Commission is empowered to establish a new policy, and apply it to the renewal of an old license, despite the fact it is inconsistent with a previous decision. This follows from the statutory duty of the Commission to examine each application for renewal of license as an original proceeding and grant or refuse it in the public interest.

As to the second issue, the Commission concluded that the provision of the contract requiring reverter of the license was contrary to the public interest. It also found that the provision that appellant shall have the right to certain broadcast periods for nearly 100 years was likewise contrary to the public interest. These provisions of the contract, i. e., the reverter of

4 Wallace Corp. v. N. L. R. B., 1944, 323 U.S. 248, 253, 65 S.Ct. 238, 89 L.Ed. 216; Brougham v. Blanton Mfg. Co., 1919, 249 U.S. 495, 501, 39 S.Ct. 363, 63 L.Ed. 725; Houghton v. Payne, 1904, 194 U.S. 88, 100, 24 S.Ct. 590, 48 L. Ed. 88; N. L. R. B. v. Baltimore Transit Co., 4 Cir., 1944, 140 F.2d 51, 54, certiorari denied, 1944, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084.

5 Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 144, 60 S.Ct. 437, 84 L.Ed. 656.

the license and the excessive time period reserved therein, afford of themselves sufficient evidence to support the Commission's conclusion and avoid the necessity of findings of fact from evidence *aliunde* the contract. This follows, we think, from those sections of the Act which preclude private ownership in a broadcast license, and which also prohibit the creation of rights in the frequencies beyond the license term.

And this brings us then to the final phase of the controversy. Enough has been said to show that the Commission's drastic ruling is punitive only so far as it affects the Church. Nothing is shown which even suggests that the Church is not equally innocent with the corporation of intentionally offending any part of the Act or any rule of the Commission. But the only condition imposed on the corporation is that the price of a renewal of its license is action on its part to rid itself of the burdens which it imposed upon itself when in good faith it acquired, with the approval of the Commission, the license and physical property of the Church. The Commission has failed to make any findings that the provisions of the contract, as to the reverter of physical property or the payment of the weekly sums stipulated in the contract, or that a contract for a lesser period of time, are contrary to the public interest. Yet its blanket order requires the licensee to abrogate completely these provisions as well as several others to which the Commission objects. As a practical result, the Church is left with what the Commission calls a right of action "in another tribunal" to secure indemnity for its loss, but this overlooks the very heart of the contract, for it is not money indemnity which the Church is seeking, and it is not money indemnity which will place it *in statu quo*. Its objective was and is the reasonable use of the facilities of its formerly owned radio station in the propagation of its religious doctrines. To deprive it of this is to destroy the bone and marrow of its being. Until now that right, confirmed by the Commis-

sion's approval, was secured by its contract. Now, it is lost in its entirety. That there may be features of the contract not sustainable under the new outlook of the Commission it does not deny. The Church has not at any time urged, nor does it now urge, that the provision for the reverter of the license can be enforced. It concedes it had no private property in such license. But this does not also concede that its other reserved rights may be destroyed without a finding that they violate the Act. On the contrary, it would seem to us that the facts we have mentioned would justify —if not require—the Commission, in recognition of those rights, to offer the applicant and the Church the opportunity to substitute for the objectionable provisions modifications that would not be contrary to the public interest, and that would save to the Church privileges necessary to its proper functioning. This would merely recognize the rule of fairness, which the Supreme Court has recognized again and again, that only those provisions that are inherently objectionable should be condemned. And in our own decisions we have often said that valuable rights and investments made in reliance on a license of the Federal Communications Commission should not be destroyed except for the most compelling reasons. Evangelical Lutheran Synod v. Federal Communications Commission, 1939, 70 App.D.C. 270, 105 F.2d 793; Journal Co. v. Federal Radio Commission, 1931, 60 App.D.C. 92, 48 F.2d 461; Chicago Federation of Labor v. Federal Radio Commission, 1930, 59 App. D.C. 333, 41 F.2d 422.

Viewed in this light, we think the Commission's order went too far. There is no novelty in the suggestion that an agreement for broadcast time within the granted license period is not violative of the public interest, for the Commission at this very time, under circumstances like those we have here, has approved a modified form of contract binding within the present life of the broadcast license.[6] In our view,

---

[6] Appellant has cited us to the contract between the First Baptist Church of Memphis and WMPS, Inc., the licensee of Radio Station WMPS, Memphis, Tenn., which was approved by the Federal Com- munications Commission on March 14, 1945, and contained the following provision: "This contract shall be for the term of the present license and thereafter shall run concurrently with renew-

248

similar action might very well be taken here. For in ordinary fairness, the Federal Communications Commission, no less than the Federal Trade Commission, owes the duty to exhaust all possible avenues of compliance with the Congressional purpose before requiring complete destruction of the private interest. In the recent case of Jacob Siegel Co. v. Federal Trade Commission,[7] the Supreme Court found that the Trade Commission had failed to consider whether the ends of the Act might not be fulfilled and at the same time valuable rights of the applicant saved, and remanded the case to the Commission for determination on that point. And before that, in Federal Trade Commission v. Royal Milling Co.,[8] the Court said that the order of the Commission should go no further than is reasonably necessary to correct the evil, while at the same time preserving the rights of competitors and of the public. Though the language of the statutes is not identical, we can think of no good reason why the same just rule is not equally applicable here.

We therefore affirm the decision of the Commission in so far as it requires the abrogation of the provisions of the contract relating to the reverter of the license, and the reservation of periods of broadcast time for nearly 100 years. But we think the Commission was in error in requiring, particularly without definite findings on that subject, the repudiation of the contract provision providing for reverter of the physical property and the weekly payments to the Church.

In addition, and for the reasons we have stated, we think the case should be remanded to the Commission to determine, on sufficient findings, whether a contract, modified as to the length of its existence, but allowing a reservation for a reasonable broadcast time, would be contrary to public interest. And we find nothing in the present rules or practice of the Commission to forbid some such arrangement on these lines.

Affirmed in part and remanded in part to the Commission for action consistent with the conclusions stated in this opinion.

als of the license for said Radio Station WMPS and without the necessity of the First Baptist Church giving any written or other notice to the station of its desire for the continuance of its rights under this said contract but limited to a total of 99 years from date, if the license is renewed from time to time for such total period."

[7] 1946, 327 U.S. 608, 66 S.Ct. 758.

[8] 1933, 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706.