Justice GINSBURG, concurring.
The Court rightly recognizes that "for a great many registration decisions issue preclusion obviously will not apply." Ante,at 1306. That is so because contested registrations are often decided upon "a comparison of the marks in the abstract and apart from their marketplace usage." 6 J. McCarthy, Trademarks and Unfair Competition § 32:101, p. 32-247 (4th ed. 2014). When the registration proceeding is of that character, "there will be no [preclusion] of the likel[ihood] of confusion issue ... in a later infringement suit." Ibid.On that understanding, I join the Court's opinion.
Justice THOMAS, with whom Justice SCALIAjoins, dissenting.
The Court today applies a presumption that when Congress enacts statutes authorizing administrative agencies to resolve disputes in an adjudicatory setting, it intends those agency decisions to have preclusive effect in Article III courts. That presumption was first announced in poorly supported dictum in a 1991 decision of this Court, and we have not applied it since. Whatever the validity of that presumption with respect to statutes enacted after its creation, there is no justification for applying it to the Lanham Act, passed in 1946. Seeing no other reason to conclude that Congress implicitly authorized the decisions *1311 of the Trademark Trial and Appeal Board (TTAB) to have preclusive effect in a subsequent trademark infringement suit, I would affirm the decision of the Court of Appeals.
I
A
The presumption in favor of administrative preclusion the Court applies today was first announced in Astoria Fed. Sav. & Loan Assn. v. Solimino,501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). In that case, the Court confronted the question "whether claimants under the Age Discrimination in Employment Act of 1967 [ (ADEA) ] ... are collaterally estopped to relitigate in federal court the judicially unreviewed findings of a state administrative agency made with respect to an age-discrimination claim." Id.,at 106, 111 S.Ct. 2166. It answered that question in the negative, concluding that the availability of administrative preclusion was an issue of statutory construction and that the particular statute at issue "carrie[d] an implication that the federal courts should recognize no [such] preclusion." Id.,at 108, 110, 111 S.Ct. 2166.
Despite rejecting the availability of preclusion, the Court nevertheless, in dictum, announced a presumption in favor of giving preclusive effect to administrative determinations "where Congress has failed expressly or impliedly to evince any intention on the issue." Id.,at 110, 111 S.Ct. 2166. That dictum rested on two premises. First, that "Congress is understood to legislate against a background of common-law adjudicatory principles." Id.,at 108, 111 S.Ct. 2166. And, second, that the Court had "long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." Id.,at 107, 111 S.Ct. 2166.
I do not quarrel with the first premise, but I have serious doubts about the second. The Court in Astoriaoffered only one decision predating the enactment of the ADEA to shore up its assertion that Congress had legislated against a background principle in favor of administrative preclusion-United States v. Utah Constr. & Mining Co.,384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). See Astoria, supra,at 107, 111 S.Ct. 2166.[1]And that decision cannot be read for the broad proposition asserted by the Court.
Like Astoriaitself, Utah Constructiondiscussed administrative preclusion only in dictum. The case arose out of a contract dispute between the United States and a private contractor. 384 U.S., at 400, 86 S.Ct. 1545. The contract at issue contained a disputes clause providing for an administrative process by which " 'disputes concerning questions of fact arising under th[e] contract' " would be decided by the contracting officer, subject to written appeal to the head of the department. Id.,at 397-398, 86 S.Ct. 1545. The Wunderlich Act of 1954 likewise provided that such administrative factfinding would be "final and conclusive" in a later breach-of-contract action " 'unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.' " Id.,at 399, 86 S.Ct. 1545. Because both "the disputes clause [of the contract] and the Wunderlich Act categorically *1312 state[d] that administrative findings on factual issues relevant to questions arising under the contract [would] be final and conclusive on the parties," the Court required the lower courts to accept those findings. Id.,at 419, 86 S.Ct. 1545. Only after acknowledging that its decision "rest[ed] upon the agreement of the parties as modified by the Wunderlich Act" did the Court go on to comment that the decision was "harmonious with general principles of collateral estoppel." Id.,at 421, 86 S.Ct. 1545.
To create a presumption based solely on dictum would be bad enough, but the principles Utah Constructionreferred to were far too equivocal to constitute "long-established and familiar" background principles of the common law of the sort on which we base our statutory inferences. Isbrandtsen Co. v. Johnson,343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952). Although Utah Constructionasserted that "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicatato enforce repose," it admitted that "courts have used language to the effect that res judicataprinciples do not apply to administrative proceedings." 384 U.S., at 421-422, 86 S.Ct. 1545. These contradictory signals are not typically the stuff of which background rules of common law are made. Cf. Kirtsaeng v. John Wiley & Sons, Inc.,568 U.S. ----, ----, 133 S.Ct. 1351, 1363, 185 L.Ed.2d 392 (2013)(presuming that Congress intended to retain the "first sale" doctrine in copyright statutes based on that common-law doctrine's "impeccable historic pedigree").
B
If the occasion had arisen in Astoriafor the Court to examine the history of administrative preclusion, it would have discovered that the issue was far from settled.
At common law, principles of res judicata and collateral estoppel applied only to a decision by a "court of competent jurisdiction." Aurora City v. West,7 Wall. 82, 102, 19 L.Ed. 42 (1869); accord, Hopkins v. Lee,6 Wheat. 109, 113, 5 L.Ed. 218 (1821); Restatement of Judgments §§ 4, 7, and Comment f,pp. 20, 41, 45 (1942). That rule came with the corollary requirement that the court be "legally constituted"-that is, a court "known to and recognized by the law." 2 H. Black, Law of Judgments § 516, p. 614 (1891). A court not "legally constituted" lacked jurisdiction to enter a legally binding judgment, and thus any such judgment could have no preclusive effect. Ibid.
Nineteenth century courts generally understood the term "court of competent jurisdiction" to include all courts with authority and jurisdiction conclusively to resolve a dispute. See J. Wells, A Treatise on the Doctrines of Res Judicata and Stare Decisis §§ 422-423, pp. 336-338 (1878); 2 Black, supra,§ 516, at 613-614. Thus, courts of law, courts of equity, admiralty courts, and foreign courts could all satisfy the requirement of a "[c]ourt of competent jurisdiction." Hopkins,6 Wheat., at 113. This broad definition served the interest in finality that supports preclusion doctrines, without which "an end could never be put to litigation." Id.,at 114.
But however broadly "[c]ourt of competent jurisdiction" was defined, it would require quite a leap to say that the concept encompasses administrative agencies, which were recognized as categorically different from courts.E.g., Pearson v. Williams,202 U.S. 281, 26 S.Ct. 608, 50 L.Ed. 1029 (1906); F. Cooper, Administrative Agencies and the Courts 241-242 (1951) (taking the position that agencies *1313 "are not courts, and their determinations are not judgments"). This distinction stems from the Constitution itself, which vests the "judicial Power" not in administrative agencies, but in federal courts, whose independence is safeguarded by certain constitutional requirements. Art. III, § 1. One of the consequences of this allocation of judicial power is that agencies possess limited ability to act in a judicial capacity in cases resolving traditional disputes between private parties. See infra,at 1304 - 1305.
It is therefore unsurprising that federal courts-including this Court-have been far more hesitant than today's majority to extend common-law preclusion principles to decisions of administrative tribunals. In Pearson,for example, this Court declined to recognize any preclusive effect of a decision of an immigration board. 202 U.S., at 284-285, 26 S.Ct. 608. Writing for the Court, Justice Holmes explained that "[t]he board is an instrument of the executive power, not a court"; that it consisted of officials "whose duties are declared to be administrative by" statute; and that "[d]ecisions of a similar type long have been recognized as decisions of the executive department, and cannot constitute res judicatain a technical sense." Ibid.
Other courts likewise declined to apply general preclusion principles to decisions of administrative agencies. For example, as late as 1947, the D.C. Circuit would rely on the "well settled doctrine that res judicataand equitable estoppel do not ordinarily apply to decisions of administrative tribunals." Churchill Tabernacle v. F.C.C.,160 F.2d 244, 246 (1947).
The Restatement of Judgments also reflected this practice: It contained no provision for administrative preclusion and explained that it would not address "the effect of the decisions of administrative tribunals." Restatement of Judgments, Scope Note, at 2. It rejected the idea of any consistent practice in favor of administrative preclusion, noting that "the question whether the decisions of a particular tribunal are binding in subsequent controversies depends upon the character of the tribunal and the nature of its procedure and the construction of the statute creating the tribunal and conferring powers upon it." Ibid.
Consistent with that comment, federal courts approved of administrative preclusion in narrow circumstances arguably involving only claims against the Government, over which Congress exercises a broader measure of control.[2]In the 19th century, for instance, this Court effectively gave preclusive effect to the decisions of the U.S. Land Department with respect to land patents when it held such patents unreviewable in federal court "for mere errors of judgment." Smelting Co. v. Kemp,104 U.S. 636, 646, 26 L.Ed. 875 (1882)("A patent, in a court of law, is conclusive as to all matters properly determined by the Land Department"). Commentators explained that these cases could not truly be understood to involve an application of res judicata or collateral estoppel-for, after all, administrative agencies are not courts-but rather a "species of equitable estoppel." Cooper, supra,at 242; see also 2 A. Freeman, Law of Judgments *1314 § 633, p. 1335 (5th ed. rev. 1925) (explaining that "the immunity from judicial review" for certain administrative decisions was "not based upon the doctrine of res judicata nor ... governed by exactly the same rules"). As one commentator put it, res judicata could "not apply, in any strict or technical sense, to the decisions of administrative agencies." Cooper, supra,at 241.
This history undercuts any suggestion in Utah Constructionthat administrative preclusion was widely accepted at common law. Accordingly, at least for statutes passed before Astoria,I would reject the presumption of administrative preclusion.[3]
II
In light of this history, I cannot agree with the majority's decision to apply administrative preclusion in the context of the Lanham Act.[4]To start, the Lanham Act was enacted in 1946, 20 years before this Court said-even in dictum-that administrative preclusion was an established common-law principle. Thus, even if one thought that the dictum in Utah Constructionwere sufficient to establish a common-law principle in favor of preclusion, that conclusion would not warrant applying Astoria's presumption to this enactment from the 1940's. And, construing the Act on its own terms, I see no reason to conclude that Congress intended administrative preclusion to apply to TTAB findings of fact in a subsequent trademark infringement suit. The Act says nothing to indicate such an intent, and several features of the Act support the contrary inference.
The first feature indicating that Congress did not intend preclusion to apply is the limited authority the Act gives the TTAB. The Act authorizes the TTAB only to "determine and decide the respective rights of [trademark] registration," 15 U.S.C. § 1067(a), thereby withholding any authority from the TTAB to "determine the right to use" a trademark or to "decide broader questions of infringement or unfair competition," TTAB Manual of Procedure § 102.01 (2014). This limited job description indicates that TTAB's conclusions regarding registration were never meant to become decisive-through application of administrative preclusion-in subsequent *1315 infringement suits. See 15 U.S.C. § 1115(a)(providing that registration of a mark "shall be prima facie evidence of the validity of the registered mark" but "shall not preclude another person from proving any legal or equitable defense or defect"). Giving preclusive effect to the TTAB's decision on likelihood of confusion would be an end-run around the statutory limitation on its authority, as all parties agree that likelihood of confusion is the central issue in a subsequent infringement suit.
A second indication that Congress did not intend administrative preclusion to apply is the Lanham Act's provision for judicial review. After the TTAB issues a registration decision, a party "who is dissatisfied with the decision" may either appeal to the Federal Circuit or file a civil action in district court seeking review. §§ 1071(a)(1), (b)(1).[5]And it is undisputed that a civil action in district court would entail de novoreview of the TTAB's decision. Ante, at 1300 - 1301. Although under ordinary preclusion principles "the failure to pursue an appeal does not undermine issue preclusion," ante, at 1305, the availability of de novojudicial review of an administrative decision does. That is true both because the judicial review afforded by the Act marks the first opportunity for consideration of the issue by an Article III court and because Congress has deviated from the usual practice of affording deference to the factfindings of an initial tribunal in affording de novoreview of the TTAB's decisions.
The decision to provide this de novoreview is even more striking in light of the historical background of the choice: Congress passed the Lanham Act the same year it passed the Administrative Procedure Act, following a lengthy period of disagreement in the courts about what deference administrative findings of fact were entitled to receive on direct review. The issue had been the subject of debate for over 50 years, with varying results. See generally 2 J. Dickinson, Administrative Justice and the Supremacy of Law 39-75 (1927). Sometimes this Court refused to review factual determinations of administrative agencies at all, Smelting Co.,104 U.S., at 640, 646, and sometimes it allowed lower courts to engage in essentially de novoreview of factual determinations, see ICC v. Alabama Midland R. Co.,168 U.S. 144, 174, 18 S.Ct. 45, 42 L.Ed. 414 (1897); Reckendorfer v. Faber,92 U.S. 347, 351-355, 23 L.Ed. 719 (1876).
In the early 20th century, the Court began to move toward substantial-evidence review of administrative determinations involving mixed questions of law and fact, ICC v. Union Pacific R. Co.,222 U.S. 541, 546-548, 32 S.Ct. 108, 56 L.Ed. 308 (1912), but reserved the authority to review de novoany so-called "jurisdictional facts." Crowell v. Benson,285 U.S. 22, 62-63, 52 S.Ct. 285, 76 L.Ed. 598 (1932). Courts then struggled to determine the boundary between jurisdictional and nonjurisdictional facts, and thus to determine the appropriate standard of review for administrative decisions. See, e.g.,Estep v. United States,327 U.S. 114, 142, 66 S.Ct. 423, 90 L.Ed. 567 (1946)(Frankfurter, J., concurring in result) (noting the "casuistic difficulties spawned" in Crowelland the "attritions of that case through later decisions"). Although Congress provided for substantial-evidence review in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), it required de novoreview in the Lanham Act.
*1316 I need not take a side in this historical debate about the proper level of review for administrative findings of fact to conclude that its existence provides yet another reason to doubt that Congress intended administrative preclusion to apply to the Lanham Act.
III
In addition to being unsupported by our precedents or historical evidence, the majority's application of administrative preclusion raises serious constitutional concerns.
A
Executive agencies derive their authority from Article II of the Constitution, which vests "[t]he executive power" in "a President of the United States," Art. II, § 1, cl. 1. Executive agencies are thus part of the political branches of Government and make decisions "not by fixed rules of law, but by the application of governmental discretion or policy." Dickinson, supra,at 35-36; see, e.g.,Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,463 U.S. 29, 59, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)(Rehnquist, J., concurring in part and dissenting in part) (An agency "is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration"). They are not constituted to exercise "independent judgment," but to be responsive to the pressures of the political branches. Perez v. Mortgage Bankers Assn.,--- U.S. ----, ----, 135 S.Ct. 1199, 1216-1217, --- L.Ed.2d ---- (2015)(THOMAS, J., concurring in judgment).
Because federal administrative agencies are part of the Executive Branch, it is not clear that they have power to adjudicate claims involving core private rights. Under our Constitution, the "judicial power" belongs to Article III courts and cannot be shared with the Legislature or the Executive.Stern v. Marshall,564 U.S. ----, ---- - ----, 131 S.Ct. 2594, 2608-2609, 180 L.Ed.2d 475 (2011); see also Perez, at ---- - ----, 135 S.Ct., at 1216-1219(opinion of THOMAS, J.). And some historical evidence suggests that the adjudication of core private rights is a function that can be performed only by Article III courts, at least absent the consent of the parties to adjudication in another forum. See Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 561-574 (2007)(hereinafter Nelson); see also Department of Transportation v. Association of American Railroads,---U.S. ----, ----, 135 S.Ct. 1225, 1242, --- L.Ed.2d ---- (2015)(THOMAS, J., concurring in judgment) (explaining that "there are certain core functions" that require the exercise of a particular constitutional power and that only one branch can constitutionally perform).
To the extent that administrative agencies could, consistent with the Constitution, function as courts, they might only be able to do so with respect to claims involving public or quasi-private rights. See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,458 U.S. 50, 68-70, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)(plurality opinion); see also Nelson 561-574; Dickinson, supra,at 6. Public rights are those belonging to the public as a whole, see Nelson 566, whereas quasi-private rights, or statutory entitlements, are those " 'privileges' " or " 'franchises' " that are bestowed by the government on individuals, id.,at 567; see, e.g., Ex parte Bakelite Corp.,279 U.S. 438, 451, 49 S.Ct. 411, 73 L.Ed. 789 (1929)(discussing claims "arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it").
*1317 The historical treatment of administrative preclusion is consistent with this understanding. As discussed above, most administrative adjudications that were given preclusive effect in Article III courts involved quasi-private rights like land grants. See Smelting Co.,104 U.S., at 646. And in the context of land grants, this Court recognized that once "title had passed from the government," a more complete form of judicial review was available because "the question became one of private right." Johnson v. Towsley,13 Wall. 72, 87, 20 L.Ed. 485 (1871).
It is true that, in the New Deal era, the Court sometimes gave preclusive effect to administrative findings of fact in tax cases, which could be construed to implicate private rights. See, e.g., Sunshine Anthracite Coal Co. v. Adkins,310 U.S. 381, 401-404, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); Tait v. Western Maryland R. Co.,289 U.S. 620, 622-624, 53 S.Ct. 706, 77 L.Ed. 1405 (1933). But administrative tax determinations may simply have enjoyed a special historical status, in which case this practice might be best understood as a limited deviation from a general distinction between public and private rights. See Nelson 588-590.
B
Trademark registration under the Lanham Act has the characteristics of a quasi-private right. Registration is a creature of the Lanham Act, which "confers important legal rights and benefits on trademark owners who register their marks." Ante, at 1305 (internal quotation marks omitted). Because registration is merely a statutory government entitlement, no one disputes that the TTAB may constitutionally adjudicate a registration claim. See Stern, supra,at ----, 131 S.Ct., at 2609-2610; Nelson 568-569.
By contrast, the right to adopt and exclusively use a trademark appears to be a private property right that "has been long recognized by the common law and the chancery courts of England and of this country." In re Trade-Mark Cases,100 U.S. 82, 92, 25 L.Ed. 550 (1879). As this Court explained when addressing Congress' first trademark statute, enacted in 1870, the exclusive right to use a trademark "was not created by the act of Congress, and does not now depend upon it for its enforcement." Ibid."The whole system of trade-mark property and the civil remedies for its protection existed long anterior to that act, and have remained in full force since its passage." Ibid.Thus, it appears that the trademark infringement suit at issue in this case might be of a type that must be decided by "Article III judges in Article III courts." Stern,564 U.S., at ----, 131 S.Ct., at 2609.
The majority, however, would have Article III courts decide infringement claims where the central issue-whether there is a likelihood of consumer confusion between two trademarks-has already been decided by an executive agency. This raises two potential constitutional concerns. First, it may deprive a trademark holder of the opportunity to have a core private right adjudicated in an Article III court. See id., at ----, 131 S.Ct., at 2610-2611. Second, it may effect a transfer of a core attribute of the judicial power to an executive agency. Cf. Perez,at ---- - ----, 135 S.Ct., at 1217-1219(opinion of THOMAS, J.) (explaining that interpretation of regulations having the force and effect of law is likely a core attribute of the judicial power that cannot be transferred to an executive agency). Administrative preclusion thus threatens to "sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our own system, wherever fundamental rights depend ... upon *1318 the facts, and finality as to facts becomes in effect finality in law." Crowell,285 U.S., at 57, 52 S.Ct. 285.
At a minimum, this practice raises serious questions that the majority does not adequately confront. The majority does not address the distinction between private rights and public rights or the nature of the power exercised by an administrative agency when adjudicating facts in private-rights disputes. And it fails to consider whether applying administrative preclusion to a core factual determination in a private-rights dispute comports with the separation of powers.
* * *
I would hold that the TTAB's trademark-registration decisions are not entitled to preclusive effect in a subsequent infringement suit. The common law does not support a general presumption in favor of administrative preclusion for statutes passed before this Court's decision in Astoria,and the text, structure, and history of the Lanham Act provide no support for such preclusion. I disagree with the majority's willingness to endorse Astoria' s unfounded presumption and to apply it to an adjudication in a private-rights dispute, as that analysis raises serious constitutional questions. Because I can resolve this case on statutory grounds, however, I leave these questions for another day. I respectfully dissent.

The Court also cited University of Tenn. v. Elliott,478 U.S. 788, 798, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), but because that decision postdated the enactment of the ADEA by almost two decades and itself primarily relied on Utah Constructionit cannot be evidence of any background principle existing at the relevant time.

This distinction reaches at least as far back as 17th-century England. See Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 413 (1958)(explaining that, since the 17th century in England, courts have been "identified with the enforcement of private right, and administrative agencies with the execution of public policy"); see also Hetley v. Boyer,Croc. Jac. 336, 79 Eng. Rep. 287 (K.B. 1614) (reviewing the actions of the "commissioners of the sewers," who had exceeded the bounds of their traditional jurisdiction and had imposed on citizens' core private rights).

I have no occasion to consider whether the discussion in Astoria, Elliott,or Utah Constructioncould be understood to create a background principle in favor of administrative preclusion that would apply, as a matter of statutory interpretation, to statutes passed after those decisions.

The majority insists that we must apply the presumption of administrative preclusion because the Court has "repeatedly endorsed Utah Construction" and the parties do not challenge "its historical accuracy." Ante,at 1305, n. 2. But regardless of whether the Court has endorsed Utah Construction's dictum, the Court has never applied the presumption of administrative preclusion to the Lanham Act. Even if the Court's description of the presumption were not dictum, no principle of stare decisisrequires us to extend a tool of statutory interpretation from one statute to another without first considering whether it is appropriate for that statute. Cf. CBOCS West, Inc. v. Humphries,553 U.S. 442, 469-470, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008)(THOMAS, J., dissenting) ("[S]tare decisis,designed to be a principle of stability or repose, [should not] become a vehicle of change whereby an error in one area metastasizes into others, thereby distorting the law"). As for the parties' lack of argument, I would not treat tools of statutory interpretation as claims that can be forfeited. If, for example, one party peppered its brief with legislative history, and the opposing party did not challenge the propriety of using legislative history, I still would not consider myself bound to rely upon it. The same is true here: Although the Court has commented in the past that the presumption of administrative preclusion would apply to other statutes, we are not bound to apply it now to the Lanham Act, even if the parties have assumed we would.

The original 1946 Lanham Act provided for appeal to the Court of Customs and Patent Appeals. See § 21, 60 Stat. 435.