Marvin SCHERE, d/b/a Jenasol Co.,
Plaintiff,

v.

Robert K. CHRISTENBERRY, Postmaster, New York, N. Y., Defendant.

United States District Court S. D.
New York.

June 17, 1959.

Bass & Friend, New York City, for plaintiff, Milton A. Bass, New York City, of counsel.

S. Hazard Gillespie, Jr., U. S. Atty., Southern Dist. of New York, New York

City, for defendant, Sherman J. Saxl, Asst. U. S. Atty., New York City, of counsel.

LEVET, District Judge.

This is a motion by the above-named plaintiff to enjoin the defendant (hereinafter sometimes referred to as the complainant) from enforcing a certain fraud order relative to receiving payment of money orders and receiving letters relating to the sale of a certain so-called "royal jelly" known as "Jenasol RJ Formula 60." The action was instituted by the filing of a complaint on April 15, 1959. The order which it is sought to enjoin was made on April 10, 1959. By cross-motion the defendant has moved for summary judgment.

Plaintiff has been marketing a product known as "Jenasol RJ Formula 60." Certain claims in respect to its beneficial effects upon various human maladies were made by plaintiff in literature sent through the mails.

The history of the proceedings connected with this matter may be summarized as follows:

(1) On March 14, 1957, a complaint was filed in the Post Office Department by the Assistant General Counsel of the Fraud Division against the Jenasol Co. and others to the effect that a fraudulent scheme was being conducted in violation of Title 39 U.S.C.A. §§ 259 and 732 and that the respondent was then and had been obtaining remittances of money through the mails for a preparation called "Jenasol RJ 60 Capsules" by means of false and fraudulent pretenses, representations and promises as hereinafter set forth. Certain advertising matter sent through the mails was attached to the complaint and it was stated therein that the respondent was representing to the public in substance and effect:

"a. That the use of the said 'Jenasol RJ 60 Capsules' will restore sexual virility to all impotent men;

"b. That the said preparation, when used as directed, will restore 'new pep and vitality' to persons lacking therein,

that is to say that the said preparation will restore general physical vigor to users deficient therein;

"c. That the said preparation, when used as directed, will restore fertility to women 'at the age of menopause';

"d. That the said preparation, when used as directed, will 'cure the ills of old age';

"e. That the use of the said preparation as directed 'grows hair', that is to say that persons with thin hair or bald heads will, by the use of the said preparation, obtain a full head of hair;

"f. That the said preparation, when used as directed, 'cures ailments ranging from Parkinson's Disease to heart conditions';

"g. That the use of the said preparation as directed will relieve 'those after 40 suffering from' 'aches and pains';

"h. That the said preparation, when used as directed, will prove 'completely successful in certain cases' of 'low blood pressure', that is to say will cure that condition;

"i. That the said preparation, when used as directed, will cure 'disabilities of the motor nerves' and 'climatic sicknesses';

"j. That the said preparation, when taken as directed, will insure substantially 'longer life' to users."

(2) On or about July 17, 1957, a hearing was commenced before the Hearing Examiner. Apparently at the outset of the hearing Marvin Schere, the owner of the enterprise conducted through the mails under the names of Jenasol Co., etc., voluntarily agreed that in the future mail order operations of his enterprise he would not represent or make any claims for the preparation being sold in said enterprise that:

"1. it will cure or eliminate sexual impotency or lost manhood in humans, except where the overall increase in vitality is reflected in an increase in sexual vitality;

"2. it will restore fertility to women at or during the age of menopause;

"3. it will grow hair or will cure baldness;

"4. it is an effective treatment for Parkinson's Disease;

"5. it is an effective treatment for heart conditions or diseases;

"6. it is an effective treatment for low blood pressure;

"7. it is an effective treatment for disabilities of the motor nerves;

"8. it is a cure for climatic (or climactic) diseases;

"9. that its use will insure human longevity." (See "Affidavit of Agreement" of July 17, 1957.)

The affidavit itself stated (a) that the acceptance of this affidavit by the Assistant General Counsel, Fraud and Mailability Division of the Post Office Department, shall not be construed as an approval of any business which the said affiant has conducted or may hereafter conduct; (b) that it was further agreed that if the Post Office Department receives evidence showing the resumption of the enterprise as therein agreed to be discontinued, in violation of the terms of this affidavit, the Assistant General Counsel may issue or cause to be issued to affiant a ten days' notice for a hearing to determine whether violation of the affidavit has been made and that in the event of any affirmative determination of that issue a fraud order may issue forthwith; (c) the affiant also stated that he understood that the filing of the affidavit will not act as a defense or relieve him of responsibility for violation of any other statute.

(3) On or about January 22, 1958, the Assistant General Counsel of the Post Office Department moved to reinstate the above-mentioned proceedings upon the ground that the respondent had violated the terms of his "Affidavit of Agreement" executed on July 17, 1957, in that he had failed to discontinue all the representations and claims set forth therein. On or about May 26, 1958, after a hearing, the Hearing Examiner found that the respondent was violating the "Affidavit of Agreement" of July 17, 1957, and recommended the issuance of a fraud order.

(4) After an appeal, and on or about July 7, 1958, the Judicial Officer concluded that the Hearing Examiner was in error; that the "Affidavit of Agreement" was not breached, and that no order could be issued based on the affidavit, but he stated that the General Counsel, should he believe that the advertising currently used by the respondent violated the statute, would not be precluded from reopening this proceeding by an amended complaint based upon the new advertising or by a new proceeding under the new Rules of Practice.

(5) On or about August 28, 1958, a new complaint was made against Jenasol Co., etc. This alleged the following misrepresentations:

"a. That the use of the respondent's product 'Jenasol RJ Formula 60' as directed will 'cure' the causes of such symptoms as 'tiredness, irritability, headaches, insomnia, physical * * * convulsions', due to its 'Royal Jelly' content;

"b. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' is 'an excellent tonic for the nerves' and insures that users will thereby obtain 'an almost immediate feeling of "well-being"';

"c. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' will 'improve the memory, normalize sexual capacities and help alleviate some of the ills of age';

"d. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' restores 'failing or worn-out glandular activities in human beings';

"e. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' 'restores' lost or waning physical 'vigor' to human beings;

"f. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' provides 'increased sex drive and energy especially to men and women over 40';

"g. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ For-

mula 60' 'normalizes all underdeveloped children';

"h. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' is 'extremely beneficial for human beings' in the improvement or correction of poor 'physical conditions';

"i. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' will substantially increase the longevity of users;

"j. That the 'Royal Jelly' content of respondent's product 'Jenasol RJ Formula 60' adds a substantial and materially valuable therapeutic effect to the other ingredients in said product."

This proceeding was brought under the Rules of Practice of the Post Office Department which were amended effective April 26, 1958 (see 23 F.R. 2794) and May 30, 1958 (23 F.R. 3775).

(6) After answer, and after certain motions to dismiss had been denied, and after an attempt to appeal from the order denying the motions to dismiss, and after consolidation of this matter with two other matters in which the same counsel appears to have been involved, a hearing was held before an Hearing Examiner on November 13, 1958.

(7) On or about December 24, 1958, the Hearing Examiner handed down a decision finding against Jenasol. Under this decision the Hearing Examiner rejected Jenasol's claims of res judicata (because of the "Affidavit of Agreement") and improper administrative procedure; held that the respondent was advertising through the mails and that the alleged representations and promises concerning the efficacy of the product were false; there was no issue concerning the respondent's use of the mails. The Examiner found that the product "is worthless to accomplish the various claims and promises made for it as hereinabove found." The respondent produced no testimony. The Examiner stated, among other things, that the fact that

a very small fraction, namely 2.89%, of royal jelly's constituents are not yet known does not lessen the weight of the testimony of the medical witness submitted by the claimant who testified as to the worthlessness of the product. The Examiner also noted that it is not the product per se that is being questioned, but the advertising claims made in connection therewith, which medical claims have been creditably and uncontrovertibly shown to be absent. The Examiner concluded that intent "might be inferred from the universality of scientific belief that the advertising representations are wholly unsupportable."

(8) The respondent took an appeal, and on or about April 10, 1959, the Judicial Officer affirmed the initial hearing of the Examiner and a fraud order was issued.

The plaintiff in a perhaps too voluminous brief has interposed a number of objections to the validity of the fraud order here at issue. The discussion which follows is limited to those objections which are germane to my ultimate determination in this matter. Certain other issues raised by plaintiff, as for example, the validity of delegation to the Judicial Officer of the power to issue final orders,[1] are not discussed since an expression of my views with respect to them would fall within that category of well intentioned but purposeless obiter dicta.

**I**

The administrative proceedings from which plaintiff seeks relief are not barred by the "Affidavit of Agreement" previously executed by plaintiff.

Ordinarily the doctrine of res judicata and equitable estoppel do not apply to decisions of administrative tribunals. Churchill Tabernacle v. Federal Communications Comm., 1947, 81 U.S. App.D.C. 411, 160 F.2d 244, 246; Wallace Corporation v. National Labor Relations Board, 4 Cir., 1944, 141 F.2d 87, 91, affirmed, 1944, 323 U.S. 248, 65 S.Ct.

---

1. The validity of such delegation of authority to the Judicial Officer was recently upheld by Judge Edmund L. Palmieri of this court in the case of United States Bio-Genics Corp. v. Christenberry, 173 F.Supp. 645.

238, 89 L.Ed. 216; Niagara Mohawk Power Corp. v. Federal Power Commission, 1952, 91 U.S.App.D.C. 395, 202 F.2d 190, 198, affirmed 1954, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686.

■ The proceedings on which plaintiff raises the defense of equitable estoppel must be carefully scrutinized: (1) There was a complaint of use of the mails to defraud by false representations (see complaint of March 14, 1957); (2) On July 17, 1957, at the outset of the hearing, Marvin Schere executed the so-called "Affidavit of Agreement"; (3) The complaint on which the present order was made is not the same as that on which the 1957 proceedings were brought.

The Department did not execute any agreement. The affidavit recites:

"That the acceptance of this affidavit by the Assistant General Counsel, Fraud and Mailability Division of the Post Office Department, as a basis for disposing of the pending charges now involved herein shall not be construed as an approval of any business which the said affiant has conducted or may hereafter conduct under the name aforesaid set forth in the caption hereof, or any other name or names;

"It is further agreed that if the Post Office Department receives evidence showing the resumption of the enterprise as herein agreed to be discontinued, in violation of the terms of this affidavit, the Assistant General Counsel, Fraud Division, Post Office Department, may issue or cause to be issued to affiant a ten (10) days' notice for a hearing to determine whether a violation of the said affidavit has been made and that in the event of any affirmative determination of that issue, a fraud order may issue forthwith against any name or names then employed by affiant in the operation of the said mail order enterprise."

At this point, what was decided, if anything? It is my belief that nothing in fact or in law was determined. The affidavit was in effect (1) a statement that respondent would not make certain obvious representations which were palpably false, but (2) the acceptance of the affidavit by the Assistant General Counsel was without prejudice to proceedings on complaints as to respondent's conduct. In short, the Hearing Examiner decided nothing. No findings were made. The "settlement" was plainly merely an indication of intent to proceed no further under certain conditions. It was not an adjudication and it did not create an equitable estoppel since it was not conclusive by its very terms. There was no agreement on the part of the government, even if the Post Office authorities were empowered to make it, which foreclosed the subsequent proceeding. Neither estoppel nor res judicata apply under the circumstances involved in these proceedings.

The Post Office Department's Rules of Practice, 23 F.R. 2794, §§ 201.3 and 201.11, do not suffice to support plaintiff's contentions. Therefore, the defense of res judicata or equitable estoppel is without merit. Accordingly, the complainant properly proceeded by way of a new complaint. I fail to see anything which barred that proceeding instituted by the new complaint on August 28, 1958.

II

The plaintiff alleges that the Hearing Examiner committed material error in limiting plaintiff's cross-examination of the defendant's medical witness, Dr. Campbell.

■ (a) On pages 32–34, plaintiff asked the witness: "Doctor, will you tell us what is a 'glycostatic effect comparable to that induced by cortisone?'" Apparently this was merely to test the physician's general medical information since the question had nothing to do with the issue involved. I am of the opinion that the objection was properly sustained under the rule of relevancy and the discretionary control by the Examiner of the extent of cross-examination.

(b) After certain approaches (SM 44–46) plaintiff asked the medical witness if he was familiar with certain literature concerning "royal jelly." The questioner allegedly read from a current list of literature issued by the United States Government (SM 46, 47). After the witness gave a number of negative answers, objection was made to a further question of the same character (SM 48) and the objection was sustained. This related to French reports published by the Laboratoire d'Histologie of the Medecins de Paris (SM 48). What the report was about or who the author of it may have been does not appear. Under the circumstances, I hold that this was not material error, even if a negative answer by the witness be assumed. The issue at the hearing was not whether royal jelly was wholly worthless, but, rather, did the plaintiff's product work the results claimed.

(c) Subsequently, plaintiff's counsel sought to examine Dr. Campbell as to articles he read which were the basis of his opinion against the curative claims of plaintiff's product (SM 61–65). The record shows that the witness had certain articles photostated and that at the hearing these were made available to counsel for the present plaintiff (SM 63). Some of these experiments related to effects not on humans but on fruit flies and other insects (SM 64). He had already testified that he was not familiar with nor had he seen any articles in any reliable medical journals reporting any value for humans, therapeutically, of royal jelly (SM 60). Some of the articles were in bee journals (SM 65). Under the circumstances, I hold that these limitations by the Hearing Examiner were warranted.

In Reilly v. Pinkus, 1949, 338 U.S. 269, at pages 275–276, 70 S.Ct. 110, at page 114, 94 L.Ed. 63, the Supreme Court ruled merely that cross-examination should be permitted as to relevant reputable authorities, and then stated: "And what we have said is not to be taken as removing this discretion or as a compulsory opening of the gates for floods of medical volumes, even where shown to be authoritative."

### III

The plaintiff contends that the Hearing Examiner wrongfully ruled that Dr. Campbell was not required to produce certain opinions previously issued by him with respect to the product involved in the present case (SM 60–61).

The plaintiff apparently based his application on the case of Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and on interpretation thereof in National Labor Relations Board v. Adhesive Products Corporation, 2 Cir., 1958, 258 F.2d 403. The Hearing Examiner held that the documents which plaintiff sought to have produced related to opinion, not factual background, and hence did not fall into the principle of the Jencks case (SM 61).

The Judicial Officer in his opinion sustained the ruling upon the position taken by the Hearing Examiner and upon the further ground that there was no indication of inconsistency or lack of credibility and no effort to lay a foundation for the production demand (Departmental decision, April 10, 1959, pp. 9–10).

Plaintiff's counsel, after taking an exception to the above ruling and stating his reasons, did not seek further information upon cross-examination by, for instance, asking Dr. Campbell if he had rendered any opinion contrary to his present opinion. He stated that he would offer no witnesses (SM 69), and when, at the conclusion of the hearing, the Examiner stated: "If you don't wish to present a defense, other than what you have stated, which I take it are not good here now, on the ultimate grounds given, then you stand at your peril for not proceeding" (SM 70), counsel for present plaintiff said: "Respondent rests." (SM 71).

Unfortunately, the record (SM 60–61) does not show the nature of Dr. Campbell's other opinions with respect to the product involved. These opinions may be the same; they may have been con-

trary. There is nothing to indicate that these opinions are within any of the terms of Rule 4.3 of the Post Office Regulations, 39 C.F.R. 4.3, and are thereby made confidential. In any event, the complainant concedes that even if these opinions were confidential matter within the purview of Rule 4.3, plaintiff would be entitled to examine them upon a timely request therefor. I have concluded that plaintiff's request for the production of these opinions during the cross-examination of Dr. Campbell was timely under the circumstances here presented. Nor was it necessary for plaintiff to seek an adjournment of the hearing in order to make additional efforts to obtain these opinions in view of the Hearing Officer's assertion that opinions, as distinguished from factual matter, are not subject to production.

The witness was presented by the complainant before the Hearing Examiner as a witness to a fact—namely, whether the product would produce the results claimed in the advertising material. This proof, it is true, came in by way of opinion, but it basically related to fact. Whether fact or opinion, it is my belief that, in all fairness, the Administrative Hearing Officer should have permitted the production of the opinions, the examination thereof and the cross-examination of Dr. Campbell in reference thereto. See National Labor Relations Board v. Adhesive Products Corporation, 2 Cir., 1958, 258 F.2d 403, 408; Communist Party of United States v. Subversive Activities Control Board, 1958, 102 U.S. App.D.C. 395, 254 F.2d 314, 327–328.

No matter how fantastic the claims of the mailed literature may be, unless we are prepared to endorse an ipse dixit opinion of the Hearing Examiner, it seems the present plaintiff should have had a fair opportunity for cross-examination of the medical witness with respect to these opinions before the Hearing Examiner. This was definitely barred. It is no answer that plaintiff did not pursue the matter further after the adverse ruling of the Hearing Officer. This was not required. See National Labor

Relations Board v. Adhesive Products Corporation, supra.

In view of the foregoing I feel that I am impelled to grant plaintiff's motion for injunctive relief with respect to the fraud order here at issue and to deny the complainant's motion for summary judgment. This is without prejudice, however, to a reopening of the proceedings against the plaintiff on the complaint of August 28, 1958, to permit additional hearings, should the complainant choose to do so.

Settle order on notice.