MORRIS LUBLINER AND CONGREGATION LENATH HAZE-DIC, APPELLANTS, v. BOARD OF ALCOHOLIC BEV-ERAGE CONTROL FOR THE CITY OF PATERSON AND AUGUSTUS HUTCHINS T/A HUTCH'S TAVERN, AND DI-VISION OF ALCOHOLIC BEVERAGE CONTROL, DE-PARTMENT OF LAW AND PUBLIC SAFETY, STATE OF NEW JERSEY, RESPONDENTS.

Argued September 13, 26, 1960—Decided November 7, 1960.

Mr. *Louis Schwartz* argued the cause for the appellants (*Messrs. Schwartz & Schwartz,* attorneys; Mr. *Sol Schwartz,* on the brief).

Mr. *Samuel B. Helfand,* Deputy Attorney General, argued the cause for the respondent Division of Alcoholic Beverage Control (Mr. *David D. Furman,* Attorney General, attorney).

*Mr. John E. Selser* argued the cause for the respondent Augustus Hutchins t/a Hutch's Tavern (*Mr. Charles Turndorf,* attorney; *Mr. Gary O. Turndorf,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division, in an opinion reported at 59 *N. J. Super.* 419 (1960), affirmed the State Director who had, in turn, sustained the action of Paterson's excise board in granting Mr. Hutchins' application for transfer of his licensed premises. We granted certification at the request of the objectors Morris Lubliner and Congregation Lenath Hazedic.

Mr. Hutchins has lawfully operated his tavern at 34 Straight Street, Paterson since 1946. In 1947 his corporation purchased a building at 39 Carroll Street and he sought to transfer his plenary retail consumption license to those premises. There were objections to his application for transfer and it was denied by Paterson's Board of Alcoholic Beverage Control. His appeal to the Division of Alcoholic Beverage Control resulted in an affirmance of the denial. In his Conclusions and Order, the Director indicated his agreement with the board's view that there were enough licensed premises in the area and noted that the burden of establishing that the board's action was erroneous rested with the licensee, that the licensee had "failed to sustain that burden" and that consequently the board's action should be affirmed.

In 1948, 1950 and 1951 Mr. Hutchins filed new applications for transfer of his licensed premises and on each occasion his application was denied by the municipal board and no appeal was taken to the Director. In 1953 he applied again and this time his application was granted by the municipal board by a vote of two to one. The two members who voted to grant were new members who had never passed on the previous applications; the member who voted to deny had voted against the granting of the previous applications. An appeal was taken by objectors and on June 18, 1954 the Director reversed the grant of the application. In his Con-

clusions and Order, he noted that it appeared from the prior proceedings that the area was adequately supplied with licensed premises, that no real public need for a license at the new premises had been established, and that the municipal board had "abused its discretion and acted in an unreasonable manner."

In 1958 Mr. Hutchins filed a further application to the municipal board which now consisted of three new members who had not passed upon any of the prior applications. A hearing was held on December 22, 1958 at which time the members of the board heard the attorneys and various witnesses in support of and in opposition to the transfer. During the hearing it was stressed on the applicant's behalf that he proposed to conduct a "high-class type of restaurant catering to colored people" and that there was need for such an establishment in the area which was "primarily a colored neighborhood." At the conclusion of the hearing, Commissioner Cheevers announced that the board would reserve decision until January 14, 1959 and that in the meantime it "would make an extensive inspection of the neighborhood."

On January 14, 1959 the attorneys for the applicant and objectors again appeared before the board; at that time Commissioner Pasquariello stated that the three board members had inspected the premises and he expressed the view that if the transfer were granted it should be accompanied by a condition requiring off-street parking facilities for patrons. At this point the attorney for Mr. Hutchins remarked that "he was authorized to furnish any written promise concerning such condition." Commissioner Cheevers then stated that he thought the area would be improved if Mr. Hutchins were to conduct a high-class type of tavern and restaurant and submitted a resolution granting the application for transfer. It was adopted by a vote of two to one with the dissenting member expressing the view that the "neighborhood does not require another tavern" and suggesting that Mr. Hutchins "put a restaurant in there first, if that is what he wants to run."

Although others had also filed objections before the board (see 59 *N. J. Super.*, at *p.* 424), the only objectors who appealed to the Director were Congregation Lenath Hazedic and Morris Lubliner. Their appeal came on for hearing on March 9, 1959 and at that time the prior applications and the minutes of the hearing before the board were made part of the record and testimony was taken. Mr. Hutchins' son testified that whereas in 1954 the neighborhood was "approximately 65% Negro and 35% white" it was now "approximately 85% Negro and 15% white" and that, while the building at 39 Carroll Street was formerly occupied by six white tenants along with ten colored tenants, no white tenants were there now. He testified further that they were "going to put in a first-class place" which would be "the type of place that would be available for meals primarily" and that there "is definitely a need" in the area for a high-class restaurant which would cater to colored people. He stated that it would be economically difficult to open a restaurant without a liquor license and that "the bulk of our customers want us to have a restaurant along with liquor that can be served because there really isn't a place in the area now, a decent looking restaurant that is patronized by colored." The nearest tavern is about two blocks away (1040 feet) although there are package stores located 100, 300 and 1000 feet respectively from 39 Carroll Street.

The objection by Congregation Lenath Hazedic was apparently grounded on the assertion that many elderly members of the Congregation would pass the premises on their way to services and might "suffer indignities if confronted by persons who loiter about a tavern." The testimony indicated that Mr. Hutchins' reputation has been good and that his tavern at 34 Straight Street has at all times been well conducted. The objection by Mr. Lubliner was apparently grounded on the assertion that many children who attend the Workmen's Circle School, a Hebrew school of which he is principal, would be obliged to pass the premises on their way to and from school in the late afternoon or

early evening. Testimony was introduced on Mr. Hutchins' behalf to indicate that hardly any of the few children who attend the school, which is about two blocks away, have occasion to pass the premises.

On June 16, 1959 the Director filed his Conclusions and Order affirming the municipal board's grant of the application. Referring to the prior applications and to his own action in 1954, he noted that the earlier denials "had gathered such impetus" that the opinion of the majority members in 1954 that the transfer was in the public interest "seemingly could not overcome the previous opinions to the contrary and, thus, their action was reversed even though the burden had shifted and rested on the appellant to establish that the grant of the transfer by the board was erroneous." After citing the precedent in *Auerbach v. Newark et al.,* Bulletin 1178, Item 1, where he had sustained the granting of a transfer after there had been a denial by an earlier board and an affirmance on appeal, the Director had this to say:

"In the instant case, the record of the action of the local Board on these applications, in sequence, is four denials of transfer and two grants of transfer, the latter two within the past five years. To again disregard the sentiment expressed by two independent respondent Boards is to maintain an adamant attitude that the passage of twelve years with the normal changes in the area to be expected is insufficient to overcome the past denials of transfers. In other words, that such denials are a bar in perpetuity or perhaps until the number of grants equals the number of denials. I do not think such is a reasonable conclusion."

At the close of his Conclusions and Order, the Director referred to a contention by the objectors that the transfer would violate the local zoning ordinance and noted that no "definite probative evidence on that score" had been presented and that generally the Division of Alcoholic Beverage Control is not the proper forum to decide whether the location of a "liquor license and restaurant at the premises would be in violation of the zoning law." The objectors took their appeal from the Director's action to the Appellate Division and

contended there that (1) under principles of *res judicata* the municipal board and the Director were obliged to adhere to the original denial of the transfer, (2) the resolution of the municipal board and the Conclusions and Order of the Director were invalid as not embodying adequate findings of fact, (3) the transfer was illegal under Paterson's zoning ordinance, and (4) the transfer was an abuse of the municipal board's discretion and the Director should have so found. These contentions were rejected in the Appellate Division and in this Court they have been renewed with the exception of the zoning contention which has apparently been abandoned. In dealing with that contention the Appellate Division properly pointed out that the grant of Mr. Hutchins' application would in nowise permit him to operate in contravention of any applicable zoning provisions; if he ever attempts to so operate, relief is readily available. See *Garrou v. Teaneck Tryon Co.*, 11 *N. J.* 294 (1953).

 *Res judicata* is an ancient judicial doctrine which contemplates that when a controversy between parties is once fairly litigated and determined it is no longer open to relitigation. See von Moschzisker, *"Res Judicata,"* 38 *Yale L. J.* 299 (1929), reprinted in *von Moschzisker, Stare Decisis, Res Judicata and Other Selected Essays, p.* 30 (1929); *Restatement Judgments* § 1, *p.* 9 (1942). Along with its related doctrine of collateral estoppel (see *Mazzili v. Accident, etc., Casualty Ins. Co., etc.*, 26 *N. J.* 307, 313 (1958)), it rests upon policy considerations which seek to guard the individual against vexatious repetitious litigation and the public against the serious burdens which such litigation imposes on the community. See *von Moschzisker, supra;* 2 *Freeman on Judgments* §§ 624–627 (1925); *cf. Commissioner of Internal Revenue v. Sunnen*, 333 *U. S.* 591, 596, 68 *S. Ct.* 715, 92 *L. Ed.* 898 (1948); *Ludy v. Larsen*, 78 *N. J. Eq.* 237, 242 (*E. & A.* 1911); *Passaic Nat. Bank, etc., Co. v. East Ridgelawn Cemetery*, 137 *N. J. Eq.* 603, 609 (*E. & A.* 1946). In earlier years the doctrine was fashioned in court proceedings which generally involved the

application of declared law to past facts static in nature (see *Wirth v. Slinn,* 10 *N. J. Misc.* 361, 363 (*Sup. Ct.* 1931); *Ludy v. Larsen, supra*); in more recent years important questions (which now concern us) arose as to the applicability of the doctrine to administrative agency proceedings which so often deal with "fluid facts and shifting policies." See 2 *Davis, Administrative Law* 545 (1958); *cf.* Groner & Sternstein, "Res Judicata in Federal Administrative Law," 39 *Iowa L. Rev.* 300 (1954); Schopflocher, "The Doctrine of Res Judicata in Administrative Law," 1942 *Wis. L. Rev. pp.* 5, 198; "Developments in the Law of Res Judicata," 65 *Harv. L. Rev.* 818, 865 (1952); "Res Judicata in Administrative Law," 49 *Yale L. J.* 1250 (1940).

In *Federal C. C. v. Pottsville Broadcasting Co.,* 309 *U. S.* 134, 142, 60 *S. Ct.* 437, 84 *L. Ed.* 656 (1940) the Supreme Court pointed out that modern administrative tribunals are generally the outgrowth of conditions which differ significantly from those applicable to common law courts; that unlike the traditional courts which deal primarily with adversary proceedings between litigants seeking to adjust conflicting claims, administrative agencies, such as those regulating transportation, communication and industry, are primarily concerned with the public interest in its relation to the needs of the community; and that this difference generally precludes the "wholesale transplantation" of the procedural rules and doctrines of the common law courts to the administrative agencies. In the light of the foregoing, many federal courts have expressed the broad view that *res judicata* does not ordinarily apply to decisions of administrative tribunals. See *Schere v. Christenberry,* 179 *F. Supp.* 900, 903 (*D. C. S. D. N. Y.* 1959); *Segal v. Travelers Ins. Co.,* 94 *F. Supp.* 123, 125 (*D. C. D. Col.* 1950); *Grandview Dairy v. Jones,* 61 *F. Supp.* 460, 462 (*D. C. E. D. N. Y.* 1945), affirmed 157 *F. 2d* 5 (2 *Cir.* 1946), *certiorari* denied 329 *U. S.* 787, 67 *S. Ct.* 355, 91 *L. Ed.* 675 (1946). But *cf. United States v. 42 Jars, More or Less, etc.,* 264 *F. 2d* 666, 669 (3 *Cir.* 1959);

2 *Davis, supra,* at *p.* 548. On the other hand, many courts have expressed the view that ordinarily *res judicata* is applicable to administrative agency decisions and that such departures as have occurred therefrom "appear to spring from the peculiar necessities of the particular case or the nature of the precise power being exercised, rather than from any general distinction between courts and administrative tribunals." See *Evans v. Monaghan,* 306 *N. Y.* 312, 118 *N. E. 2d* 452, 458 (1954) ; *cf.* von Moschzisker, *supra,* 38 *Yale L. J.,* at *pp.* 329–330.

In *Finnegan v. Miller,* 132 *N. J. L.* 192, 195 *(Sup. Ct.* 1944), the former Supreme Court indicated that *res judicata* would be as fully applicable in administrative agency proceedings as in court proceedings so long as the agency proceedings could properly be termed as *"quasi-*judicial" in nature. But this approach was soundly questioned in *Central Home Trust Co. v. Gough,* 5 *N. J. Super.* 295, 299 *(App. Div.* 1949) where the Appellate Division noted that the term was in no sense a precise one and that courts frequently differ as to whether particular action is *quasi-*judicial; the court referred approvingly to the suggestion in *Schopflocher, supra,* that a more satisfactory approach would be to ascertain from the terms of the organic act governing the agency, and with particular regard to the nature of the proceeding and its effect upon private interests and the provisions for notice, hearing, finality and review, whether the Legislature contemplated that the administrative determination should attain the status of a common law judgment with its customary attributes. *Cf. R. S.* 34:15–58; *Mangani v. Hydro,* 119 *N. J. L.* 71 *(E. & A.* 1937). Professor Davis likewise rejects judicial attempts to rest on the *quasi-*judicial label or to deal in absolutes which would declare the doctrine either applicable or inapplicable to all administrative agency decisions; he notes that the sound reasons which underly the proper use of *res judicata* in the courts apply fully to some administrative agency proceedings but not at all to others and that the doctrine should be used selectively and

invoked whenever and wherever it serves as a "proper and useful tool for administrative justice." 2 *Davis, supra,* at *p.* 559. See also Groner & Sternstein, *supra,* 39 *Iowa L. Rev.,* at 310.

In *Russell v. Tenafly Bd. of Adjustment,* 31 *N. J.* 58 (1959), the defendant Pond applied in 1955 to the board of adjustment for a variance which would allow him to modify the setback line and the minimum area requirement of the local zoning ordinance. The plaintiff Russell objected and both Pond and Russell appeared before the board with their respective counsel. After two hearings there was a denial of the application; in 1957 Pond applied again for a variance and this time it was granted by the board. In dealing with the issue as to whether the denial in 1955 precluded the later application, Justice Burling's opinion stated generally that *"res judicata* is applicable to actions heard by a zoning board of adjustment." See 2 *Davis, supra,* at *p.* 564; *cf. Stafford Smith v. Zoning Bd., etc., Bor. of Madison,* 59 *N. J. Super.* 553, 559 (*App. Div.* 1960), certif. denied, *Smith v. Kirkpatrick,* 32 *N. J.* 352 (1960). He stressed that the proceedings were "formal and adversary," that the function of the board in deciding the application was "essentially factfinding, as opposed to policymaking," and that the board was confined in its action to evidence and facts which were duly made part of the record. See 31 *N. J.,* at *pp.* 65–66. See also *Tomko v. Vissers,* 21 *N. J.* 226, 239 (1956); *Grundlehner v. Dangler,* 29 *N. J.* 256, 271 (1959); *cf.* 59 *N. J. Super.,* at *p.* 429. Justice Burling noted that the issue before the board was whether there had occurred "a sufficient change in the application itself or in the conditions surrounding the property to warrant entertainment of the application"; that it was for the board to find in the first instance whether this requirement had been met and its finding would not be overturned judicially in the absence of a showing of unreasonableness; and that in the case at hand the new plans which accompanied the second application provided for an increased setback and a decreased dwell-

ing area and under the circumstances the "board did not abuse its discretion in considering the second application on its merits." See 31 *N. J.*, at *pp.* 66–67.

The situation in *Central Home Trust Co. v. Gough, supra,* 5 *N. J. Super.* 295, may be contrasted with the situation in *Russell*. The Union County Trust Company applied by letter to the Commissioner of Banking and Insurance for permission to change the location of its branch office in the City of Elizabeth. In due course the Commissioner advised the applicant that he had investigated the matter and had disapproved the application. Thereafter the Union County Trust Company applied again and this time the Commissioner granted the application after a formal hearing in which the objector, Central Home Trust Company, participated. On appeal, the objector contended that the original denial of the application was *res judicata* and that, consequently, the Commissioner exceeded his authority in granting the second application. This contention was rejected by the Appellate Division in an opinion which stressed the informality of the proceedings resulting in the original denial, the ever continuing responsibility of the agency to administer the provisions of its governing statute in the public interest, and the absence of anything in the Banking Act to indicate a legislative intent to preclude a further application after an original denial under the circumstances presented. See 5 *N. J. Super.*, at *pp.* 300–301; *cf. In re Mutual Benefit Life Ins. Co.,* 35 *N. J. Super.* 113, 116 (*App. Div.* 1955); *Goddard v. County Bd. of Elections, Monmouth County,* 27 *N. J. Super.* 30, 33 (*App. Div.* 1953).

In *Mulcahy v. Public Service Commission,* 101 *Utah* 245, 117 *P. 2d* 298 (1941), the Commission denied a trucking company's application for a certificate of convenience and necessity to operate as a common carrier in designated territory. A rule of the Commission provided that after denial of an application, no further application could be made until the expiration of one year. A second application was filed more than one year after the filing of the first ap-

plication and in due course it was granted by the Commission. An objector appealed to the Supreme Court of Utah which sustained the Commission's action; in the course of its opinion, the court found the doctrine of *res judicata* inapplicable and stressed that the trucking company's second application "was addressed to the discretion of the Commission for its determination of matters pertaining primarily to the needs and conveniences of the public, and not to rights theretofore vested in, or obligations theretofore assumed or imposed upon either of the parties before the court in this action, or their privies." See 117 *P. 2d,* at *p.* 304; see also *Cantlay & Tanzola v. Public Service Commission,* 120 *Utah* 217, 233 *P. 2d* 344 (1951).

In *Panhandle Eastern Pipeline Co. v. Federal Power Comm.,* 236 *F. 2d* 289 (3 *Cir.* 1956), the Commission denied Panhandle's application to reduce its natural gas service to Michigan Consolidated; on appeal, Panhandle asserted that the Commission had in 1947 authorized the partial abandonment of its service to Michigan Consolidated and had determined Panhandle's obligations to that company in proceedings which involved the issuance of a certificate of public convenience and necessity to an affiliate of Michigan Consolidated. Panhandle contended that this action of the Commission must be given effect under principles of *res judicata;* in rejecting this contention, Judge Maris stated that the doctrine of *res judicata* could have no application to a proceeding "which involves a determination of the present or future public convenience or necessity with respect to the continuance or abandonment of natural gas service." See 236 *F. 2d,* at *p.* 292. In *Churchill Tabernacle v. Federal Communications Comm.,* 81 *U. S. App. D. C.* 411, 160 *F. 2d* 244 (*C. A. D. C.* 1947), the court rejected a contention that the Commission was bound, under principles of *res judicata,* to abide by an earlier approval of the provisions of a contract of sale; it expressed the view that the Commission was empowered to reject an old policy, adopt a new one, and apply it to the renewal of a license which had

been issued to permit the operation of a radio station; and it noted that this conclusion followed "from the statutory duty of the Commission to examine each application for renewal of license as an original proceeding and grant or refuse it in the public interest." See 160 *F. 2d,* at *p.* 246.

New Jersey's Alcoholic Beverage Control Act (*N. J. S. A.* 33:1–1 *et seq.*) contains no provisions which deal with the effect of a prior denial upon a later application. *R. S.* 33:1–24 provides, in very general terms, that the municipal issuing authority shall receive applications for licenses, investigate the applicants and inspect the premises sought to be licensed, conduct public hearings on applications and revocations, enforce the provisions of the act and the regulations thereunder and take such action as is designed "to insure the fair, impartial, stringent and comprehensive administration" of the act. Unlike the zoning variance provision (*N. J. S. A.* 40:55–39) which was dealt with in *Russell v. Board of Adjustment of Tenafly, supra,* 31 *N. J.* 58, *R. S.* 33:1–24 does not in itself embody negative and affirmative standards which must be satisfied and dealt with in detailed findings of fact. See *N. J. S. A.* 40:55–39; *Tomko v. Vissers, supra,* 21 *N. J.,* at *pp.* 237, 240; *Grundlehner v. Dangler, supra,* 29 *N. J.,* at *p.* 270. And unlike the zoning board of adjustment's function in the *Russell* case, there described as "essentially factfinding" rather than policy-making, the municipal issuing authority's function in determining whether additional licenses shall be allowed in the municipality or in particular areas, is primarily a policy determination on the basis of facts which are generally undisputed. Where the municipal issuing authority reasonably entertains the opinion that it is in the public interest to do so, it is free to alter an earlier policy determination and this is particularly true where it was made by predecessor members who no longer hold office. It may be noted that we are not here concerned with other functions under the Alcoholic Beverage Control Act such as those involved in suspension and revocation proceedings under *N. J. S. A.*

33:1–31; it would seem that the doctrines of *res judicata* and collateral estoppel would generally attach to findings in such proceedings since the sound reasons underlying the proper use of the doctrines in the courts would be fully applicable. See 2 *Davis, supra,* at *p.* 559; 59 *N. J. Super.,* at *p.* 430.

All licenses under the Alcoholic Beverage Control Act are annual licenses which may be renewed annually upon due application and approval. *N. J. S. A.* 33:1–26. When Mr. Hutchins first applied for a transfer he operated a tavern under a license which expired on June 30, 1947. His application was denied and the denial was sustained on appeal. Since the Director had not adopted any regulation fixing a time which must expire before the making of a second application (*cf. Mulcahy v. Public Service Commission, supra,* 117 *P. 2d,* at *p.* 304), Mr. Hutchins was at liberty to file a new application at an early date and he did so in 1948. The board denied this application as well as later applications in 1950 and 1951. In 1953 Mr. Hutchins applied again, pointing out that he intended to operate a restaurant at 39 Carroll Street; the board, by a divided vote, granted the application. In reversing this action, the Director did not decide that the application was precluded under principles of *res judicata* or collateral estoppel nor did he discuss any issue as to the need for, or the public interest in, the establishment of a restaurant in the area. Mr. Hutchins did not apply again until 1958 and this time he repeatedly stressed that he intended to operate a high-class restaurant catering to colored patrons and that there was definite need for such a restaurant in the area.

After taking testimony and making an investigation of the neighborhood, Commissioner Cheevers expressed the view that the area would be improved if Mr. Hutchins were to conduct a high-class tavern and restaurant and that the transfer should be allowed. He was joined by one of the two other members of the board. Their determination that the application should be granted was primarily one of dis-

cretion and policy and was made in the light of basic facts and circumstances which were largely undisputed; presumably they gave due consideration and weight to the earlier history of the matter and concluded, nevertheless, that the public interest (see *Tp. Committee of Lakewood Tp. v. Brandt*, 38 *N. J. Super.* 462, 465 (*App. Div.* 1955)) would now be served by enabling the establishment, as proposed by Mr. Hutchins, of a "decent looking restaurant" which would be patronized by colored people and which could not be economically operated without a liquor license. They are not to be barred from conscientiously exercising their judgment and effectuating the public interest as they now reasonably see it because of the actions taken on the earlier applications. See *Mulcahy v. Public Service Commission, supra,* 117 *P. 2d* 298; *Churchill Tabernacle v. Federal Communications Comm., supra,* 160 *F. 2d* 244; *cf. Central Home Trust Co. v. Gough, supra,* 5 *N. J. Super.* 295; *Panhandle Eastern Pipeline Co. v. Federal Power Comm., supra,* 236 *F. 2d* 289. See also *Warburton v. Warkentin,* 185 *Kan.* 468, 345 *P. 2d* 992 (1959); *cf.* Annotation 73 *A. L. R. 2d* 939 (1960). The soundness of this approach would be even more patent if a person other than Mr. Hutchins were seeking the transfer of a license for use in connection with the operation of a restaurant in the area for here the common law *res judicata* concept would admittedly have no application; it would indeed be incongruous to sanction a transfer to such new applicant while permanently precluding the equally and perhaps more qualified earlier applicant. See 2 *Davis, supra,* at *p.* 564.

When the board's action was appealed in 1959 the Director rejected the contention that the doctrine of *res judicata* precluded the grant of the application. This was consistent with earlier departmental practices which are entitled to weight here. See *Eskridge v. Division of Alcoholic Beverage Control,* 30 *N. J. Super.* 472, 478 (*App. Div.* 1954). While properly looking with disfavor on the filing of vexatious repetitious applications which present no altered

circumstances or policies, the Division has always recognized the right of municipal issuing authorities to alter, in the reasonable exercise of their discretion, their earlier policies particularly where there have been membership changes. See *Whalan v. Township Committee of the Township of Mt. Olive,* Bulletin 1103, Item 2 (1956); *Tolen v. Mayor & Council of the Town of Kearny,* Bulletin 880, Item 1 (1950); *Hearty v. Township Committee of the Township of Liberty,* Bulletin 671, Item 5 (1945); *Northend Tavern, Inc. v. Mayor & Council of the Borough of Northvale,* Bulletin 493, Item 5 (1942). In the *Whalan* case the Director had this to say:

"The decision in the former appeal, *Thompson v. Mount Olive Township, supra,* is not binding upon respondent Committee as presently constituted. The general rule of law is that no governing body may tie the hands of its successors in matters involving the exercise of discretion. *Northend Tavern, Inc. v. Northvale,* Bulletin 493, Item 5. Each application is a separate one and must be decided in the sound discretion of the local issuing authority as constituted at the time the application is considered. *Tolen v. Kearny et al.,* Bulletin 880, Item 1.

The number of licenses which should be permitted in any given section of a municipality is a need to be determined in the sound discretion of the local issuing authority. My function on appeal is not to substitute my personal opinion for that of the local issuing authority but merely to determine whether reasonable cause exists for its opinion and, if so, to affirm irrespective of my own personal opinion. *Hudson Bergen County Retail Liquor Stores Association v. North Bergen et al.,* Bulletin 997, Item 2. This is particularly true where the proposed location is in an area devoted to business. The mere fact that other licensed premises also serve the same area is not the controlling factor. *Guarino v. Newark et al.,* Bulletin 1069, Item 2." Bulletin 1103, *pages 5, 6*

In his Conclusions and Order dated June 16, 1959, the Director referred to the normal changes in the area and to the official expressions of sentiment favorable to the grant in 1953 and again in 1958. He did not find the board's action unreasonable but rather considered that it would be unreasonable on his part to interfere with the local policy which it represented. Bearing in mind the breadth of his authority and the weight of his responsibility in a field

placed specially under his expert charge, we find no justification for reaching a contrary conclusion and vacating the transfer. See *Hickey v. Division of Alcoholic Beverage Control*, 31 *N. J. Super.* 114 (*App. Div.* 1954); *Rajah Liquors v. Div. of Alcoholic Bev. Control*, 33 *N. J. Super.* 598 (*App. Div.* 1955), certif. denied, 18 *N. J.* 204 (1955); *cf. Belmar v. Div. of Alcoholic Beverage Control*, 50 *N. J. Super.* 423 (*App. Div.* 1958).

The appellants urge that the grant of the application for transfer should be set aside because the "determinations of the liquor agencies failed to contain basic findings of fact with the reasons therefor." The statute states that the Director shall determine every appeal by a written decision which sets forth his conclusions and reasons (*R. S.* 33:1–38); we are satisfied that his formal Conclusions and Order dated June 16, 1959 fairly complied with the terms and purposes of the statutory direction. However, the statute contains no express requirement that the municipal issuing authority file any formal findings of fact or reasons (see *R. S.* 33:1–24) and the Director has not thus far promulgated any procedural rule or regulation imposing such requirement. See *Borough of Fanwood v. Rocco*, 33 *N. J.* 404 (1960). Nonetheless, it would appear highly desirable, where an application is granted after a hearing at which objectors appear, that the municipal issuing authority express its factual determinations and reasons. See *Application of Howard Savings Institution of Newark*, 32 *N. J.* 29, 52 (1960); *In re Greenville Bus Co.*, 17 *N. J.* 131, 146 (1954); *Wharton Sand & Stone Co. v. Montville Tp.*, 39 *N. J. Super.* 278, 283 (*App. Div.* 1956). In the instant matter, the basic facts were largely undisputed and the reasons for the board's action were fairly implicit in the expression of the view that the area would be improved by an establishment of the type proposed by Mr. Hutchins. While the board's reasons might well have been elaborated and incorporated along with factual findings in the formal resolution granting the transfer, we fail to see how the appellants were in anywise prejudiced by the omission. See

*Application of Howard Savings Institution of Newark, supra,*
32 *N. J.,* at *p.* 53; *In re Greenville Bus Co., supra,* 17 *N. J.,*
at *p.* 148.

Finally, the appellants urge that the liquor agencies
abused their discretionary powers in approving the transfer
because the applicant had failed to prove a "public need"
for the establishment of a tavern. The Alcoholic Beverage
Control Act does not set forth any express standard of public
need and the judicial opinions which have sought to import
it have recently been brought into question. See *Fanwood
v. Rocco,* 59 *N. J. Super.* 306, 323 (*App. Div.* 1960),
affirmed 32 *N. J.* 348 (1960); *Tp. Committee of Lakewood
Tp. v. Brandt, supra,* 38 *N. J. Super.,* at *p.* 465. When the
board considered the application for transfer to the Carroll
Street premises it did so with understanding of the nature
of the area and the dangers associated with the sale of alcoholic
beverages; its responsibility was high, its discretion was wide,
and its guide was the public interest (see *Tp. Committee
of Lakewood Tp. v. Brandt, supra,* 38 *N. J. Super.,* at *p.* 466;
*cf. In re Greenville Bus Co., supra,* 17 *N. J.,* at *p.* 143);
when it concluded to grant the application, it presumably
determined that its action furthered the public interest. See
2 *Davis, supra,* at *p.* 456. On their appeal to the Director
the appellants were offered ample opportunity to present
evidence and argument in opposition to the grant; indeed,
an opportunity to examine the members of the board which
was offered to them was declined with the remark that "the
record will speak for itself." The Director, after considering
the record, found nothing to move him to the conclusion that
the board's action should be set aside as unreasonable.

Although Mr. Hutchins did establish that the nearest
tavern was about two blocks distant from 39 Carroll Street,
he did not seek to persuade the board that a new tavern,
operated solely as such, should be licensed in the neighbor-
hood. He produced testimony, which the board could rea-
sonably credit and act upon, that he would operate a high-
type restaurant catering to colored patrons, and that there

was need in the area for such a restaurant which could not be operated successfully except in conjunction with an alcoholic beverage license. The appellants contend that it was improper and perhaps violative of principles against discrimination grounded on race, color or creed, for the board to give consideration to the need for a restaurant catering to colored persons in the neighborhood. But this contention need not detain us for there is no suggestion whatever of invidious discrimination or the exclusion of white patrons and acknowledgment of the need was simply fair and factual recognition of the prevailing circumstances. Many liquor licenses have heretofore been properly issued on condition that the licensed premises "be operated and conducted as a *bona fide* restaurant." See, *e. g., Curry v. Board of Commissioners of the City of Margate City, Bulletin* 472, *Item* 7; *Asbury Park Licensed Beverage Association v. City Council of City of Asbury Park, Bulletin* 911, *Item* 3; cf. *R. S.* 33:1–32. The resolution granting the transfer in the instant matter should have expressly embodied such a condition as well as a condition requiring the maintenance of suitable off-street parking facilities for patrons. To that end the Appellate Division's affirmance of the Director's action is modified but in all other respects it is affirmed.

Modified. No costs.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Opposed*—None.